# GAS PURCHASE CONTRACT
## (POP)
## COYANOSA PLANT AREA

This Gas Purchase Contract ("Contract") is entered into and effective November 1, 2012 ("Effective Date") between **Southern Union Pipeline, Ltd.** ("Southern") and **Arabella Petroleum Company, LLC**("Seller").

<u>COMMITMENT; DELIVERY CONDITIONS</u>

1.01    Upon the terms and conditions of this Contract (including Exhibits A and B attached hereto and incorporated herein), and in consideration of the mutual covenants herein, Seller agrees to sell to Southern and Southern agrees to buy from Seller, Gas as described in Exhibit A Paragraph A and on Exhibit B ("Seller's Gas").

1.02    Seller will deliver, or cause to be delivered, Seller's Gas, as produced in its natural state, to Seller's Delivery Points, subject to Section 1.03 and Exhibit A Sections C, G and H. Seller must deliver Seller's Gas in compliance with Exhibit A Section G in order to prevent damage to Southern's facilities or operations. Should damage to Southern's facilities occur, Seller agrees to bear the reasonable costs of such damage if it can be proven that Seller delivered gas not in compliance with Exhibit A, Section G and such deliveries caused the damage to Southern's facilities.  No facilities, unless otherwise allowed in this Contract, may be employed to reduce the quantity or Btu content of Seller's Gas prior to Seller's Delivery Points.

1.03    Southern will provide, at its expense, facilities to receive Seller's Gas at Seller's Delivery Points. Seller will provide, at its expense, facilities required to deliver Seller's Gas, including mechanical separation facilities prior to Seller's Delivery Points to prevent the delivery of free liquids and safety pressure relief systems sufficient to prevent over pressurization of Southern's facilities. Seller agrees to deliver Seller's Gas at reasonably uniform and consistently measurable flow rates, and when applicable, such that intermittent flow rates and induced pulsation, if any, are limited to levels that do not interfere with industry-accepted measurement practices. Seller agrees to deliver Seller's Gas such that the combined effects of pressure, temperature and gas composition preclude the formation of Hydrates, as referenced in Section 20 of the GPSA "Engineering Data Book".

1.04    The normal operating pressure in Southern's facilities at each of Seller's Delivery Points will not exceed fifty (50) psig; if actual pressure exceeds seventy five (75) psig for thirty (30) or more days during any ninety (90) consecutive day period, Seller may require Southern to release the commitment of Seller's Gas at that Seller's Delivery Point at the expiration of thirty (30) days notice, when notice is given within forty-five (45) days following the ninety (90) consecutive day period.  Seller's notice will be deemed withdrawn if Southern demonstrates that corrective measures to restore the normal operating pressure have been initiated.  Seller shall not deliver Seller's Gas at Seller's Delivery Points at pressures in excess of Southern's maximum allowable operating pressure of 1440 psig, ("MAOP"), as Southern may from time to time determine and notify Seller.

1.05    For the purposes of this Contract, Southern may elect to receive, at Seller's Delivery Points, any of Seller's Gas that does not comply with Exhibit A, Section G. If Southern elects to receive Seller's Gas which does not so comply, Southern may request that Seller enter into a mutually agreeable arrangement for Southern's handling of such Seller's Gas.  Such agreement may include additional requirements with which Seller's Gas must comply in order to prevent damage

to Southern's facilities or operations.  If the parties cannot agree upon a mutually agreeable arrangement to handle Seller's Gas, Seller may terminate this Contract upon the giving of fifteen (15) days prior written notice to Southern. Should damage to Southern's facilities occur, Seller agrees to bear the reasonable costs of such damage if it can be proven that Seller delivered gas not in compliance with Exhibit A, Section G and such Deliveries caused the damage to Southern's facilities.  Notwithstanding the foregoing, no such agreement shall constitute a continuing obligation of Southern to receive any of Seller's Gas that does not comply with Exhibit A, Section G.

PRICING

2.01    In full consideration for all of Seller's Gas delivered hereunder, Southern will pay Seller for the following components of Seller's Gas measured each calendar month at each of Seller's Delivery Points:

For Seller's Calculated Plant Products: the appropriate percentage, based on the Schedule below, of the amount determined by multiplying the gallons of each of Seller's Calculated Plant Products by the price, respectively, in the Schedule below for each Plant Product less a fee of ten cents ($0.10) per gallon.

Table 1

| |
|---|
| The simple average of the midpoint of the daily high and daily low quotes for each reporting day of each month shown in the Oil Price Information Service (OPIS) under the heading "U.S. & Canada Spot LP-Gas Weekly Averages" subheading "Mont Belvieu" for:<br><br>E-P Mix for ETHANE,<br>Non-TET for PROPANE,<br>TET for ISOBUTANE,<br>TET for N. BUTANE, and<br>Non-TET for N. Gasoline |

After the Effective Date, the Fee will be adjusted from time to time by the actual change in the combined transportation and fractionation ("T&F") rates.  T&F consists of (1) the actual weighted average of rates borne by Southern for transportation of natural gas liquids on all Lone Star NGL LLC (or any successor entity) pipeline(s) for transportation from any and all of Southern's plants to Mt. Belvieu, using the month prior to the Effective Date as the base month and the rates from the month prior to the month of production as the basis for the adjustment, and (2) the actual fractionation rates borne by Southern, using the month prior to the Effective Date as the base month and the rates from the month prior to the month of production as the basis for the adjustment.

For Seller's Residue Gas: the appropriate percentage, based on the Schedule below, of the amount determined by multiplying the MMBtus of Seller's Residue Gas by the monthly average of the price published for each flow day by *Gas Daily* and quoted in the "Daily Price Survey" under the heading "Midpoint: Permian Basin Area" for "El Paso Permian Basin".  For any day for which no price is published, the arithmetic average shall be calculated by using the posted price for the last day published, immediately preceding such day, and such price shall be used for each subsequent day for which no price is posted, subject to the alternative pricing provisions below.  If any of the prices are unavailable, then Southern may use a price which will be the weighted average net proceeds per MMBtu received by Southern from all sales of Residue Gas by Southern attributable to Gas received into its facilities gathering Gas for processing in Southern's Coyanosa Processing Plant for the month, so long as said price is reflective of market prices.  Seller recognizes that some of the sales of Residue Gas by Southern may be made to an

*TTS*

affiliated purchaser and agrees that all sales by Southern of Residue Gas, including such affiliated sales, will be used to determine the price in any month in which this alternative pricing provision is in effect. If the published prices are non-reflective of market prices, Southern and Seller will negotiate in good faith to agree on a replacement price. Until agreement is reached, Southern will specify a price to be used; upon agreement, the agreed-upon price will be effective the month following agreement.

## SCHEDULE

| Volume from each of Seller's Delivery Points (average Mcf/day during production month) | Plant Product/Residue Gas |
|---|---|
| Less than 1000 Mcf/day | 84% / 84% |
| Equal to or greater than 1000 Mcf/day | 86% / 86% |

Southern will calculate and deduct from Seller's payment occupation, processing, sales and other taxes, (including 100% of Texas State severance tax reimbursement but excluding income taxes and income tax withholding) imposed by taxing authorities applicable to the purchase and processing of Seller's Gas and sale of Seller's Calculated Plant Products and Seller's Residue Gas. In addition, if the quantity of Seller's Gas at any of Seller's Delivery Points operated by Seller or its designee is less than three hundred (300) Mcf for any calendar month other than the calendar month of first deliveries of Seller's Gas, Southern will deduct two hundred fifty dollars ($250) from Seller's payment each month for each of such Seller's Delivery Points. In the event Southern declares a Force Majeure event pursuant to Exhibit A, Section K, or otherwise declares a curtailment, and as a result Seller is precluded from delivering the minimal volume described in the preceding sentence, Seller shall be relieved from the two hundred fifty dollars ($250) deduction and will not be subjected to a lower price tier, until such time as the event or curtailment is alleviated to the extent necessary to allow Seller to resume the flow of required volume.

Southern will calculate and deduct from Seller's payment a value calculated for a treating fee, if applicable as follows. If Acid Gas is greater than two percent (2%) mole, Southern will deduct an amount equal to five cents ($0.05) per percent for all Acid Gas over two percent (2%) mole multiplied by Seller's Delivery Point Mcfs. For example, if Acid Gas is three and one-half percent (3.5%) mole, the resulting treating fee would be seven and one-half cents ($0.075) multiplied by Seller's Delivery Point Mcfs. If Acid Gas mole percent is under two percent (2%) mole, no treating fee is charged. Any such deduction shall not relieve Seller of their obligation to comply with Exhibit A Section G.

## TERM

3.01    This Contract will be in effect (a) for a primary term beginning on the Effective Date and ending at the expiration of ten years (10) from the Effective Date and (b) month to month thereafter unless terminated by either party effective at the expiration of the primary term or periodic renewal per Section 3.01(b) of such date by notice to the other party at least sixty (60) days prior to the date of termination.

## NOTICE; SELLER'S REPRESENTATIVE

4.01    Seller may designate, in this Section, a Seller's Representative to perform certain administrative functions, which must be specified herein, on its behalf. However, notices will be given only to and only by Seller, unless otherwise specifically agreed to in writing.

TTG

4.02    Notice(s) must be in writing and will be effective upon receipt via service requiring evidence of receipt or electronically via fax, in accordance with the instructions below, which may be changed with notice.

Southern:       Southern Union Pipeline, Ltd.
                301 Commerce Street, #700
                Fort Worth, TX 76102
                Attn:  Contract Administration
                817-302-9400
                817-302-9352    fax

Seller:                                                 Seller's Representative:

Arabella Petroleum Company, LLC

500 W. Texas Ave., Suite 1450

Midland, Texas 79701

(432) 897-4755

Jason T. Hoisager


Payments:

Arabella Petroleum Company, LLC

500 W. Texas Ave., Suite 1450

Midland, Texas 79701


Tax ID#: 20-8435954

**SELLER:**                                             **SOUTHERN:**
**ARABELLA PETROLEUM COMPANY, LLC**                     **SOUTHERN UNION PIPELINE, LTD.**


Name: Jason Hoisager                                    Richard S. Rehm
Title: President                                        Executive Vice President

TTG

**EXHIBIT A**
to Gas Purchase Contract dated November 1, 2012

<u>DEFINITIONS</u>

A. **Acid Gas** – Combined mole percent of hydrogen sulfide and carbon dioxide contained in Seller's Gas at Seller's Delivery Point(s).

**Applicable Law** - all statutes; regulations; codes; ordinances; decrees; rules; judicial, arbitral, administrative, ministerial, departmental or regulatory judgments, orders, decisions, rulings, or awards; restraints; guidelines; directives; agreements with, requirements of, or instructions by any governmental body or agency; general principles of common or civil law; and equity.

**Btu** - the amount of heat required to raise the temperature of one pound of water from fifty-nine degrees Fahrenheit (59°F) to sixty degrees Fahrenheit (60°F).

**Delivery Point(s)** - the inlet of Southern's equipment used to receive Gas into Southern's facilities

**Emissions** - any gaseous, liquid, solid or other substance emitted by Southern's facilities. Emissions include, without limitation, carbon dioxide ("$CO_2$"), sulfur dioxide ("$SO_2$"), nitrogen oxides ("$NO_x$"), mercury ("$Hg$") and volatile organic material ("VOM").

**Gas** - hydrocarbons and non-hydrocarbons, both in the vapor phase

**GPM** - gallons of ethane and heavier liquefiable hydrocarbons per Mcf of Gas

**Waha Hub Fee** – fee for access through the Waha hub for residue gas sales

**Mcf**–one thousand (1,000) cubic feet

**MMBtu**–one million (1,000,000) Btu

**Plant Product(s)** - the mixed natural gas liquids streams consisting exclusively of gallons of ethane and heavier liquid hydrocarbons

**psia** - pounds per square inch absolute

**psig** - pounds per square inch gauge

**Residue Gas** - the quantity in MMBtus of merchantable gaseous hydrocarbons and non-hydrocarbons remaining after other dispositions of Gas

**Seller's Delivery Point(s)** - the inlet of Southern's equipment used to receive Seller's Gas

**Seller's Calculated Plant Product(s)** - Plant Product(s) determined for Seller's Gas in accordance with Exhibit A, Section I

**Seller's Gas**- one hundred percent (100%) of the working interest ownership of Gas at Seller's Delivery Point(s)

**Seller's Residue Gas** - Residue Gas determined for Seller's Gas in accordance with Exhibit A Section I

## TITLE; REPRESENTATIONS AND WARRANTIES

B.    Title to Seller's Gas will vest in Southern at Seller's Delivery Points, and after vesting, Southern will have exclusive use of Seller's Gas. Seller warrants that it has good title to, ownership of and the right to commit to the performance of this Contract and sell Seller's Gas, and that Seller's Gas is free of liens or claims of any type. Seller will, upon request, furnish Southern written documentation of Seller's title, ownership of and/or right to commit and sell Seller's Gas. Should Seller be unable or unwilling to obtain the right to commit and sell all of Seller's Gas, Seller agrees to furnish Southern the name, address and ownership percentage of each working interest owner. Seller agrees and understands that initial receipts of Seller's Gas may be delayed until all working interest ownership is committed to Southern. Seller will defend, indemnify and hold Southern harmless from, any adverse consequences of any nature caused by a breach of this Section or from claims of any type affecting Seller's Gas prior to vesting of title in Southern. If title to or right to sell Seller's Gas is questioned by any person, Southern may withhold, without interest, any payment due Seller, attributable to the Gas that is in question, until Southern has been furnished documentation which, in Southern's sole judgment, resolves such question.

## SELLER'S RESERVATIONS

C.    Seller may use Seller's Gas, prior to Seller's Delivery Points, for fuel for development or operation of Seller's leases or for delivery to lessors entitled to a portion of Seller's Gas or for fuel for operation of Seller's facilities required to deliver Seller's Gas.

Seller may pool or unitize all or part of its leases with other leases, but Seller's Gas, irrespective of the pool or unit formed, will remain subject to this Contract.

Seller may dispose of any gas not taken by Southern for any reason, including events of force majeure, subject to Southern's right to resume takes after reasonable prior notice is provided to Seller.

Seller will bear and remit to the proper authority all taxes due on Seller's Gas such as severance, production, ad valorem, franchise and income.

Seller will bear and disburse payments for royalties, working interests and similar interests, for which obligation Seller will defend, indemnify and hold Southern harmless as provided in Exhibit A Section B.

In the event the Southern's 16-inch pipeline is not in service by July 1, 2013, Seller shall have a one-time option to terminate this Contract with thirty (30) days written notice to Southern. If Seller has not exercised its election to terminate, as set forth above, prior to the 16-inch pipeline in service date, then the option is terminated.

## SOUTHERN'S RESERVATIONS

D.    Southern's receipt of Seller's Gas which does not comply with one or more of the provisions of Exhibit A Section G at any of Seller's Delivery Points does not modify the continuing requirement that Seller's Gas so comply; Southern may, at any time, discontinue or curtail receipt of Seller's Gas which does not so comply. If the parties cannot agree upon a mutually agreeable arrangement to handle Seller's Gas, Seller may terminate this Contract with respect to the affected Delivery Points as to the then productive zones upon the giving of fifteen (15) days prior written notice to Southern, provided that during the notice period Southern may resume and maintain consistent takes and purchases and thereby avoid Contract termination as provided herein. Should damage to Southern's facilities occur, Seller agrees to bear the reasonable costs

of such damage if it can be proven that Seller delivered gas not in compliance with Exhibit A, Section G and such Deliveries caused the damage to Southern's facilities.

Southern may, in its sole discretion and from time to time, modify Exhibit A Section I, as to shrinkage factors only, to reflect changes in industry practice or to improve accuracy or consistency.

Should Southern be required to reduce natural gas liquids extraction from Seller's Gas to respond to a loss or limitation of access to natural gas liquids markets, Southern may reduce the Seller's Calculated Plant Products percentages to reflect such change for the applicable period; provided however, the reduction in natural gas liquids shrink MMBtu shall appear as a corresponding increase in residue gas MMBtu.

Notwithstanding anything contained in this Contract to the contrary, in the event there is a change in any Applicable Law or regulation after the Effective Date of this Contract which results in a governmental authority imposing an additional economic burden on Southern in connection with or related to Seller's Gas, including but not limited to any tax, assessment, emission credit expense, or other cost or expense, any of which are based upon greenhouse gas ("GHG") content or emissions (collectively, "Emissions Charges") assessed on Southern's owned or controlled gathering systems, plants, compressors or associated facilities utilized in performing the gathering, treating, and processing services for Seller's Gas as contemplated in this Contract ("Southern Facility(s)"), then Southern shall provide written notice to seller of any such Emission Charges. Such notice shall contain the amount, purpose, duration, and description of the Southern Facility incurring such Emission Charges and Seller's pro rata share of the Emission Charges necessary to comply with such new law or regulation.

Within thirty (30) days following receipt of Southern's notice, Seller shall notify Southern that either (i) Seller agrees to reimburse Southern for Seller's pro rata share of the Emission Charges as set forth in Southern's notice; or (ii) Seller does not agree to reimburse Southern for Seller's pro rata share of the Emission Charges due to the Emission Charges being inconsistent with industry practices or causing this Contract to become uneconomic for Seller. Should Seller substantiate that the Emission Charges are not consistent with industry practices or renders the Contract uneconomic, Seller shall use a reasonable effort to offer a reasonable alternative methodology for the calculation of Emission Charges. Thereafter, Southern and Seller will meet to discuss the Emission Charges and enter into good faith negotiations for a fee mechanism. If Seller and Southern do not agree on a fee mechanism, within sixty (60) days from the date Seller notifies Southern that it does not agree to pay its pro rata share of the Emission Charges, then Southern shall have the right to terminate this Contract or charge a fee substantially in accordance with Seller's alternative methodology for the calculation of Emission Charges and substantiated industry practice. In the event Southern elects to terminate this Contract, such termination shall become effective on the first day of the month not less than ninety (90) days following receipt by Seller of Southern's notice.

Southern will own, collect and dispose of liquid hydrocarbons (other than Plant Products) after the Delivery Points; Seller will bear no cost or responsibility nor receive any compensation for disposition thereof.

Southern may suspend receipts of Seller's Gas if, in Southern's opinion, such receipts:

> are dangerous to personnel or damaging to facilities; or
> are economically impracticable due to pressure, quantity, Btu content, GPM content; or
> any reason beyond Southern's control.

In the event that Southern suspends receipt of Seller's Gas for a period greater than thirty (30) consecutive days, for the reasons above, Seller may terminate this contract by giving Southern thirty (30) days written notice.

Southern has the continuing right to discontinue operation of all or part of its facilities and terminate this Contract if, in Southern's opinion, such facilities are dangerous to personnel, or are economically impracticable effective at the expiration of ninety (90) days following notice from Southern to Seller.

Southern has the continuing right to suspend receipt of Seller's Gas during testing, repair, maintenance or construction of its facilities.

Southern may elect, upon thirty (30) days notice, to cease receipts of Seller's Gas at any of Seller's Delivery Points that have a volume of ten (10) Mcf per day or less. Seller understands and agrees that this action is to be considered a disconnect pursuant to the appropriate state regulations. Should Seller attain volumes greater than twenty (20) Mcf per day at a Delivery Point previously temporarily disconnected under this paragraph regarding measurement only, Southern will reconnect the delivery point. However, in the event the meter is permanently disconnected, Southern will reconnect the delivery point if Seller's Volumes are one hundred (100) Mcf per day or greater. If Seller's volumes are less than one hundred (100) Mcf per day then Seller shall reimburse Southern for the Delivery Point reconnection cost.

<u>METERS MEASUREMENT</u>

E.    Seller's Gas will be measured by Southern by orifice meter(s) of standard make, furnished by Southern, as follows:

> In accordance with the most commonly-used version of the AGA - Gas Measurement Committee Report No. 3.
>
> Atmospheric pressure of thirteen and two-tenths (13.2) psia
>
> Reynolds Number, Expansion Factor, Manometer Factor of one (1)
>
> Compressibility in accordance with AGA – Gas Measurement Committee Report No. 8 (if in excess of one hundred (100) psig)
>
> Meter testing at least once each quarter

When Southern's measurement or testing equipment is malfunctioning or otherwise in error, or if calculations are found to be in error, adjustments will be made to return to proper operation and calculation. If, as a result of malfunction, error or failure, an inaccuracy for any month exceeds two percent (2%) and one hundred (100) Mcf, a measurement and accounting adjustment will be made. When the period of known inaccuracy cannot be determined, the accounting adjustment will encompass a period extending over the last one-half of the time elapsed since the last period of known accuracy. The volume of any inaccuracy will be determined as follows:

1) by using the volumes from Seller's operated check metering equipment, but Seller must have a single meter, adjacent to Southern's meter, which has been installed, maintained, and operated in conformance with standard industry practice and which is registering accurately.

2) If 1) above does not apply, then by applying a mathematical correction factor based on the difference found during testing/calibration of Southern's meter or equipment

3) If 2) above does not apply, then by estimation of the volumes based on historical data from a reasonable number of periods when the measurement was known to be accurate.

Notwithstanding any other provision of this Contract, except with Southern's written permission, Seller may not install check measurement equipment on Southern's facilities or site, or in any position which will interfere with Southern's facilities.

Seller will use reasonable efforts to test/calibrate its meter each time Southern's meter is tested/calibrated, with each party witnessing the other's testing/calibration. Seller, or its designee, will be given reasonable advance notice of the time of scheduled testing/calibration. If Seller does not witness the scheduled testing/calibration, the results will be effective as if Seller had witnessed the scheduled testing/calibration, except pursuant to a Special Test provided for in Section F.

All original charts, volume data, test reports and other similar records will be preserved for a period of at least twenty-four (24) months prior to the current month, or twenty-four (24) months prior to the month in which a measurement inaccuracy was determined to exist. Neither Southern nor Seller is required to provide the other any records or charts referenced in this paragraph on an ongoing or monthly basis.

## GAS COMPOSITION

F.     Seller's Gas will be sampled by Southern quarterly, or at other times deemed appropriate in Southern's sole judgment, to determine specific gravity, GPM, Btu content of hydrocarbons  per cubic foot (on a saturated with water vapor basis at fourteen and sixty-five hundredths (14.65) psia and sixty degrees Fahrenheit (60° F) or on a saturated with water vapor basis at actual delivery conditions, whichever is the higher water vapor content) and other factors by using chromatography or other commonly-used, industry-accepted methodology, specifically including GPA – Technical Standards Publication No. 2145. Continuous sampling may be used in lieu of periodic sampling.

Seller (or a designee in lieu of Seller), will be given reasonable advance notice of the scheduled time of sampling. If Seller does not witness scheduled sampling, the results will be effective as if Seller had witnessed the scheduled sampling, except pursuant to a Special Test below. Continuous sampling cylinders will be pulled concurrent with scheduled testing/calibration of the meter, provided for in Article E.

Special Test: a test requested by Seller upon reasonable advance notice at any other time than a scheduled testing/calibration or sampling is considered a Special Test. Southern will use good faith efforts to conduct a Special Test at the time requested by Seller. If the results of the Special Test do not result in an accounting and measurement adjustment, Seller agrees to bear the reasonable costs incurred by Southern in conducting the Special Test.

## QUALITY

G.     Seller's Gas at each of Seller's Delivery Points will be free of injected chemicals, dust, rust, solids, liquids, air, impurities and other objectionable substances and will contain:

a minimum of 1100 Btu per cubic foot

one-quarter (1/4) grain or less hydrogen sulfide per one hundred (100) cubic feet

five (5) grains or less total sulfur per one hundred (100) cubic feet

three-quarter (3/4) grain or less mercaptans per one hundred (100) cubic feet

one and one-quarter (1 1/4) grains or less organic sulfur (including mercaptans, mono-, di- and poly-sulfides) per one hundred (100) cubic feet

2% (mole) or less total Acid Gas

2% (mole) or less carbon dioxide

2% (mole) or less nitrogen

No oxygen

4% (mole) or less total diluents (including carbon dioxide, nitrogen, helium or other diluent compound)

a maximum temperature of one hundred twenty degrees Fahrenheit (120°F)

## NO MINIMUM QUANTITY; RATABLE TAKES

H.   Southern has no obligation to receive or buy any specific quantity of Seller's Gas. Additionally, if any of Southern's facilities are incapable of receiving all Gas available at the Delivery Points, Southern will instead receive Gas, including Seller's Gas, in accordance with the rules of the appropriate regulatory entity or based on such factors as Southern deems appropriate in the circumstances.

If Southern performs or fails to perform any act in connection with or relating to this Contract and that action or inaction is not a breach of this Contract but is deemed by a governmental authority to be a "disconnect" from a well or lease, then Seller hereby expressly gives its written consent to that action or failure to act.

## SETTLEMENT METHODOLOGY

I.   Seller's Calculated Plant Products:

> Seller's Inlet Gallons of Ethane x 75%
> Seller's Inlet Gallons of Propane x 92%
> Seller's Inlet Gallons of isobutane x 95%
> Seller's Inlet Gallons of norbutane x 95%
> Seller's Inlet Gallons of pentanes+ x 95%

Seller's Inlet Gallons: Seller's Delivery Point Mcf x Seller's GPM by component

Seller's GPM: GPM determined in accordance with Exhibit A Section F

Seller's Residue Gas = Seller's Delivery Point MMBtus less Shrinkage and Gas Usage

Shrinkage (MMBtus):
> Seller's Calculated Plant Products Ethane gallons x .066340 MMBtu/gallon
> Seller's Calculated Plant Products Propane gallons x .091563 MMBtu/gallon
> Seller's Calculated Plant Products isobutane gallons x .099630 MMBtu/gallon
> Seller's Calculated Plant Products norbutane gallons x .103740 MMBtu/gallon
> Seller's Calculated Plant Products iso-pentane gallons x .109680 MMBtu/gallon
> Seller's Calculated Plant Products nor-pentane gallons x .110870 MMBtu/gallon
> Seller's Calculated Plant Products hexanes+ gallons x .117843 MMBtu/gallon

Gas Usage = 13% of Seller's Delivery Point MMBtus

The Gas Usage percentage shall increase by an amount equal to the percentage of Acid Gas over one percent (1%) mole. For example, if Gas Usage is sixteen percent(16%) of Seller's Delivery Point MMBtus and Acid Gas is three and one-half percent(3.5%) mole, the resulting Gas Usage would be eighteen and one-half percent(18.5%) of Seller's Delivery Point MMBtus. If Acid Gas mole percent is one percent (1%) mole, no modification to Gas Usage shall be made. Any such Gas Usage increase shall not relieve Seller of their obligation to comply with Exhibit A Section G.

Gas Usage will include but not be limited to Fuel, Flare, Gas Losses, Leaks, Unaccountable, and other uses of Gas by Southern.

## STATEMENTS; PAYMENTS; RECORDS

J.  Not later than the twenty-fifth (25th) day of each month, Southern will provide Seller a statement reflecting purchases of Seller's Gas from each of Seller's Delivery Points during the preceding calendar month. Not later than the last day of each month, Southern will make payment for purchases during the preceding calendar month. Either party may, on reasonable notice, perform an audit in the other party's offices for the purpose of determining the accuracy of the statements, payments and supporting documentation thereof (including meter testing, gas analysis and similar); provided, however all settlements will be final and no adjustment will be made after the lapse of twenty-four (24) calendar months following the calendar month of receipt of Seller's Gas, unless notice of said inaccuracy has been given during said twenty-four (24) calendar months.

## FORCE MAJEURE

K.  Except as to payment obligations, neither Southern nor Seller will be liable or considered in default when delay or failure of performance is caused by circumstances beyond its reasonable control and occurring without its fault or negligence including, without limitation, failure of performance by third-parties. In the event of Force Majeure, Seller shall be paid based upon the average daily volume of the actual flow days for the production month affected by the Force Majeure event.

## ASSIGNMENT

L.  This Contract may be assigned by Southern or Seller (both "Assignor") and it will be binding on Assignor's assignees, successors, heirs or personal representatives (all "Assignee") as follows:

Prior to assignment, Assignor will advise Assignee of the existence of this Contract and of the commitment of Seller's Gas pursuant to Section 1.01 thereto.

Prior to assignment, Assignor will require, and Assignee will agree, that Assignee will assume Assignor's obligations in this Contract.

Assignor will timely furnish proper evidence of assignment to the non-Assignor.

This Contract may not be assigned except in compliance with the above requirements and Assignor must obtain the non-Assignor's written consent prior to a partial Assignment of this Contract.

## OTHER PROVISIONS

M.   Seller bears complete responsibility for Seller's Gas prior to Seller's Delivery Points.  Southern bears complete responsibility for Seller's Gas in and after Seller's Delivery Points, if delivered in accordance with the provisions of this Contract.

Interpretation and enforcement of this Contract will be governed by the laws of the State of Texas.  This Contract is deemed performable at Southern's principal office in Tarrant County, Texas.

Neither Seller nor Southern will be liable to the other for consequential, incidental or punitive damages arising from action or omission relating to performance or non-performance of the provisions of this Contract.  This Contract may be amended in writing only, executed by Seller and Southern.

This Contract terminates and supersedes any prior agreement(s) between the parties hereto or their predecessors in interest, insofar as the properties described in Exhibit B of this Contract are covered by such agreement(s).

This Contract was negotiated and drafted by both Southern and Seller and represents the entire agreement of the parties (*consensus ad idem).*  No prior or contemporaneous agreement, written or oral, modifies the terms of this Contract.

**EXHIBIT B**
to Gas Purchase Contract dated November 1, 2012
Seller's Gas

ACREAGE DEDICATION

Section 24 PSL, Block C8, Reeves, County, Texas

*TTG*

## AMENDMENT TO GAS PURCHASE CONTRACT

This AMENDMENT TO GAS PURCHASE CONTRACT ("Amendment") is entered into effective the 1st day of April, 2013 by and between Southern Union Pipeline, Ltd. ("Southern") and Arabella Petroleum Company, LLC ("Seller").

### WITNESSETH:

WHEREAS, Southern and Seller are parties to that certain Gas Purchase Contract effective November 1, 2012, as amended, (hereinafter collectively referred to as the "Contract"), covering Seller's interest in certain leases covering certain properties in Reeves County, Texas; and

WHEREAS, Southern and Seller desire to amend the Contract.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

I.

Exhibit "B" ACREAGE DEDICATION, of the Contract is hereby amended to add the following acreage in Reeves County Texas:

E/2 of Section 180, Block 13 H&GN RR Co. Survey (*Clayton Williams Energy Inc. gathers gas from the above dedication and will provide a monthly allocation from its meter to Southern*)

Middle 320 acres of Section 140, Block 13, H&GN RR. Co. Survey

II.

All defined terms in this Amendment, to the extent not defined herein, shall have the same meaning as set forth in the Contract. Except as modified by this Amendment, the Contract shall remain in full force and effect as originally written and the Contract as amended is hereby ratified and confirmed. All references to the Contract shall mean and refer to the Contract as amended by this Amendment.

IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the day and year first written above.

SOUTHERN:

Southern Union Pipeline, Ltd.

By: _____

Name: Richard S. Rehm

Title:   Executive Vice President

SELLER:

Arabella Petroleum Company, LLC

By: _____

Name: Jason Hoisager

Title: President

Arabella 01P270



**REGENCY**

301 Commerce Street
Suite 700
Fort Worth, TX 76102
Main   817.302.9400
Fax    817.302.9350
www.regencyenergy.com

June 12, 2013

Clayton Williams Energy Inc.
Attn: Rick Boring
6 Desta Drive, Ste. 1100
Midland, TX 79705

Phone: 432-688-3849

Re:     Monthly Allocation from Clayton Williams Energy Inc. (CWEI) meter # 80375
        Gas Purchase Contract effective July 1, 2011
        Regency Field Services, formerly Southern Union Pipeline, LTD ("Buyer") File#: 01P242

Arabella Petroleum Inc. LLC. will be delivering gas to Buyer through meter #80375 currently assigned to CWEI.   A monthly allocation of gas flowing through meter # 80375 is necessary for Buyer to ensure proper payment.

CWEI agrees to provide a monthly allocation to Buyer within twenty-four (24) hours after CWEI receives the total meter volume and allocation request from Buyer.  Such request is currently sent on or about the eighth (8th) business day of the month.

Regards,

Richard S. Rehm
Vice President
Regency Field Services, LLC

Accepted and agreed to effective June 1, 2013.

Clayton Williams Energy Inc.

By: _Rick Boring_____

Name: _Rick Boring_____

TG

## AMENDMENT TO GAS PURCHASE CONTRACT

This AMENDMENT TO GAS PURCHASE CONTRACT("Amendment") is entered into effective the 1st day of September, 2013 by and between Regency Field Services LLC, formerly Southern Union Gas Services, Ltd. ("Buyer") and Arabella Petroleum Company, LLC("Seller").

### WITNESSETH:

WHEREAS, Buyer and Seller are parties to that certain Gas Purchase Contract dated November 1, 2012(as amended, collectively referred to as the "Contract"), covering Seller's interest in Reeves County, Texas; and

WHEREAS, Buyer and Seller desire to amend the Contract.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

I.

Exhibit "A" Section "C" paragraph 4 of the Contract is hereby deleted in its entirety and replaced as follows:

"Buyer will bear and remit to the proper authority severance tax as due on Seller's Gas. Seller will bear and remit to the proper authority any other taxes due on Seller's Gas such as ad valorem, franchise and income tax.

In the event that Seller has multiple wells flowing behind a meter Seller shall provide Buyer with the name, location, and lease number of each well flowing behind each meter as set forth in Seller's P4. Seller shall provide a monthly allocation per well to Buyer within 24 hours after receiving the total meter volume and allocation request from Buyer. Such request is currently sent on or about the eighth (8th) business day of the month."

II.

All defined terms in this Amendment, to the extent not defined herein, shall have the same meaning as set forth in the Contract. Except as modified by this Amendment, the Contract shall remain in full force and effect as originally written and the Contract as amended is hereby ratified and confirmed. All references to the Contract shall mean and refer to the Contract as amended by this Amendment.

IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the day and year first written above.

BUYER
Regency Field Services, LLC
   By: Regency Gas Services LP, its sole member
   By: Regency OLP GP LLC, its general partner

Jim Holotik
Vice President

SELLER
Arabella Petroleum Company, LLC

Name: _____
Title: President

Arabella 01P270

GL-AIC-JCRK
040114

**GAS LIFT AMENDMENT**

This GAS LIFT AMENDMENT is entered into this 1st day of February, 2014, by and between REGENCY FIELD SERVICES LLC, successor-in-interest to Southern Union Pipeline, Ltd. ("Buyer") and ARABELLA PETROLEUM COMPANY, LLC ("Producer").

**WITNESSETH:**

WHEREAS, Buyer and Producer are parties to that certain Gas Purchase Contract dated November 1, 2012, as amended, Buyer's File Number 01P270 ("Contract"), covering Producer's interest in the Graham #1H well located in Reeves County, Texas, Buyer's Meter Number 80399 ("Well"); and

WHEREAS, the parties desire to amend the Contract to enable Producer to receive gas from Buyer for gas lift service for the Well from a new meter installed at a mutually agreeable location ("Gas Lift Meter"); and

NOW THEREFORE, Buyer and Producer agree as follows:

I.

Buyer shall construct and install the Gas Lift Meter and all pipelines, valves, and related facilities ("Gas Lift Facilities") required to measure and deliver gas to Producer for gas lift at the Well. Buyer shall at all times be the sole owner and operator of the Gas Lift Facilities.

II.

Producer will pay Buyer the sum of twenty-five thousand dollars ($25,000) as aid in construction. Upon receipt of such payment from Producer and execution of this Amendment, Buyer will proceed with the installation of the Gas Lift Facilities in a timely manner consistent with Buyer's normal operating practice.

III.

For purposes of assessing fees and fuel and determining amounts due under Section 2.01 and Exhibit "A", Section "I", Gas Usage, of the Contract, Buyer shall deduct the quantity of gas measured at the Gas Lift Meter from the quantity of gas received from the Well. In the event the quantity of Gas Lift Gas, in MMBtu, delivered to Producer over the course of a month is greater than the quantity of gas, in MMBtu, delivered from the Well during the same month, such excess MMBtu for such month shall be referred to as "Excess Gas Lift Gas." Producer shall pay Buyer as follows: ("EGLG Value"):

$(A \times B) + (C \times D) = EGLG\ Value$

Where:

A = the quantity of Residue Gas allocated to Producer attributable to the Excess Gas Lift Gas; and
B = the price that Buyer pays to Producer for the purchase of Producer's share of Residue Gas hereunder, as set forth in Section 2.01; and

GL-AIC-JCRK
040114

C = the quantity of Plant Products allocated to Producer attributable to the Excess Gas Lift Gas; and

D = the price that Buyer pays to Producer for the purchase of Plant Products, as set forth in Section 2.01.

The Contract is amended to the extent noted herein. In all other respects, it is confirmed and shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Gas Lift Amendment as of the date set forth above.

**BUYER:**

**REGENCY FIELD SERVICES LLC**

**By: Regency Gas Services LP, its sole member**

**By: Regency OLP GP LLC, its general partner**

By: _____

Name: Jim S. Holotik

Title: Vice President


**PRODUCER:**

**ARABELLA PETROLEUM COMPANY, LLC**

By: _____

Name: _____ Bill Elliott _____

Title: _____ VP Operations _____

GL-AIC-JCRK
040114

## GAS LIFT AMENDMENT

This GAS LIFT AMENDMENT is entered into this 1st day of February, 2014, by and between REGENCY FIELD SERVICES LLC, successor-in-interest to Southern Union Pipeline, Ltd. ("Buyer") and ARABELLA PETROLEUM COMPANY, LLC ("Producer").

### WITNESSETH:

WHEREAS, Buyer and Producer are parties to that certain Gas Purchase Contract dated November 1, 2012, as amended, Buyer's File Number 01P270 ("Contract"), covering Producer's interest in the Graham #1H well located in Reeves County, Texas, Buyer's Meter Number 80399 ("Well"); and

WHEREAS, the parties desire to amend the Contract to enable Producer to receive gas from Buyer for gas lift service for the Well from a new meter installed at a mutually agreeable location ("Gas Lift Meter"); and

NOW THEREFORE, Buyer and Producer agree as follows:

I.

Buyer shall construct and install the Gas Lift Meter and all pipelines, valves, and related facilities ("Gas Lift Facilities") required to measure and deliver gas to Producer for gas lift at the Well.  Buyer shall at all times be the sole owner and operator of the Gas Lift Facilities.

II.

Producer will pay Buyer the sum of twenty-five thousand dollars ($25,000) as aid in construction.  Upon receipt of such payment from Producer and execution of this Amendment, Buyer will proceed with the installation of the Gas Lift Facilities in a timely manner consistent with Buyer's normal operating practice.

III.

For purposes of assessing fees and fuel and determining amounts due under Section 2.01 and Exhibit "A", Section "I", Gas Usage, of the Contract, Buyer shall deduct the quantity of gas measured at the Gas Lift Meter from the quantity of gas received from the Well.  In the event the quantity of Gas Lift Gas, in MMBtu, delivered to Producer over the course of a month is greater than the quantity of gas, in MMBtu, delivered from the Well during the same month, such excess MMBtu for such month shall be referred to as "Excess Gas Lift Gas."  Producer shall pay Buyer as follows:  ("EGLG Value"):

$(A \times B) + (C \times D) = EGLG \text{ Value}$

Where:

A = the quantity of Residue Gas allocated to Producer attributable to the Excess Gas Lift Gas; and
B = the price that Buyer pays to Producer for the purchase of Producer's share of Residue Gas hereunder, as set forth in Section 2.01; and

GL-AIC-JCRK
040114

C = the quantity of Plant Products allocated to Producer attributable to the Excess Gas Lift Gas; and
D = the price that Buyer pays to Producer for the purchase of Plant Products, as set forth in Section 2.01.

The Contract is amended to the extent noted herein.  In all other respects, it is confirmed and shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Gas Lift Amendment as of the date set forth above.

**BUYER:**

**REGENCY FIELD SERVICES LLC**
**By:  Regency Gas Services LP, its sole member**
**By:  Regency OLP GP LLC, its general partner**

By: _____
Name:  Jim S. Holotik
Title:    Vice President


**PRODUCER:**
**ARABELLA PETROLEUM COMPANY, LLC**

By: _____
Name: _____
Title: _____

GL-AIC
081513

## GAS LIFT AMENDMENT

This GAS LIFT AMENDMENT is entered into this 1st day of February, 2014, by and between REGENCY FIELD SERVICES LLC, successor-in-interest to Southern Union Pipeline, Ltd. ("Buyer") and ARABELLA PETROLEUM COMPANY, LLC ("Producer").

### WITNESSETH:

WHEREAS, Buyer and Producer are parties to that certain Gas Purchase Contract dated November 1, 2012, as amended, Buyer's File Number 01P270 ("Contract"), covering Producer's interest in the Graham #1H well located in Reeves County, Texas, Buyer's Meter Number 80399 ("Well"); and

WHEREAS, the parties desire to amend the Contract to enable Producer to receive gas from Buyer for gas lift service for the Well from a new meter installed at a mutually agreeable location ("Gas Lift Meter"); and

NOW THEREFORE, Buyer and Producer agree as follows:

I.

Buyer shall construct and install the Gas Lift Meter and all pipelines, valves, and related facilities ("Facilities") required to measure and deliver gas to Producer for gas lift at the Well ("Gas Lift Gas"). Buyer shall at all times be the sole owner and operator of the Facilities.

II.

Producer will pay Buyer the sum of twenty-five thousand dollars ($25,000) as aid in construction. Upon receipt of such payment from Producer and execution of this Amendment, Buyer will proceed with the installation of the Facilities in a timely manner consistent with Buyer's normal operating practice.

III.

For purposes of assessing fees and fuel and determining amounts due under Section 2.01 and Exhibit "A" Section "I" Gas Usage of the Contract, Buyer shall deduct the quantity of gas measured at the Gas Lift Meter from the quantity of gas received from the Well. In the event the quantity of Gas Lift Gas, in MMBtu, delivered to Producer over the course of a month is greater than the quantity of gas, in MMBtu, delivered from the Well during the same month, such excess MMBtu for such month shall be referred to as "Excess Gas Lift Gas." Producer shall pay Buyer as follows: ("EGLG Value"):

$(A \times B) + (C \times D) = EGLG\ Value$

Where:

A = the quantity of Residue Gas allocated to Producer attributable to the Excess Gas Lift Gas; and
B = the average price that Buyer receives for the sale of all Residue Gas during the subject month; and
C = the quantity of Plant Products allocated to Producer attributable to the Excess Gas Lift Gas; and

GL-AIC
081513

D = the weighted average product price received by Buyer from purchasers of all plant products during the subject month at the tailgate of the Plant for each hydrocarbon component, net of all direct and indirect expenses, taxes, fees, and adjustments incurred by Buyer in connection with the sale, transportation and delivery of such plant products.

The Contract is amended to the extent noted herein. In all other aspects, it is confirmed and shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Gas Lift Amendment as of the date set forth above.

**BUYER:**

**REGENCY FIELD SERVICES LLC**

**By:  Regency Gas Services LP, its sole member**

**By:  Regency OLP GP LLC, its general partner**

By: _____

Name:  Jim S. Holotik

Title:    Vice President

**PRODUCER:**

**ARABELLA PETROLEUM COMPANY, LLC**

By: _____

Name: _____

Title: _____

GL-AIC
030114

## GAS LIFT AMENDMENT

This GAS LIFT AMENDMENT is entered into this 1st day of March, 2014, by and between REGENCY FIELD SERVICES LLC, successor-in-interest to Southern Union Pipeline, Ltd. ("Buyer") and ARABELLA PETROLEUM COMPANY, LLC ("Producer").

### WITNESSETH:

WHEREAS, Buyer and Producer are parties to that certain Gas Purchase Contract dated November 1, 2012, as amended, Buyer's File Number 01P270 ("Contract"), covering Producer's interest in the Sec 23 CRP well located in Reeves County, Texas, Buyer's Meter Number 80393 ("Well"); and

WHEREAS, the parties desire to amend the Contract to enable Producer to receive gas from Buyer for gas lift service for the Well from a new meter installed at a mutually agreeable location ("Gas Lift Meter"); and

NOW THEREFORE, Buyer and Producer agree as follows:

I.

Buyer shall construct and install the Gas Lift Meter and all pipelines, valves, and related facilities ("Gas Lift Facilities") required to measure and deliver gas to Producer for gas lift at the Well. Buyer shall at all times be the sole owner and operator of the Gas Lift Facilities.

II.

Producer will pay Buyer the sum of twenty-five thousand dollars ($25,000) as aid in construction. Upon receipt of such payment from Producer and execution of this Amendment, Buyer will proceed with the installation of the Gas Lift Facilities in a timely manner consistent with Buyer's normal operating practice.

III.

For purposes of assessing fees and fuel and determining amounts due under Section 2.01 and Exhibit "A" Section "I" Gas Usage of the Contract, Buyer shall deduct the quantity of gas measured at the Gas Lift Meter from the quantity of gas received from the Well. In the event the quantity of Gas Lift Gas, in MMBtu, delivered to Producer over the course of a month is greater than the quantity of gas, in MMBtu, delivered from the Well during the same month, such excess MMBtu for such month shall be referred to as "Excess Gas Lift Gas." Producer shall pay Buyer as follows: ("EGLG Value"):

$(A \times B) + (C \times D) = EGLG\ Value$

Where:

A = the quantity of Residue Gas allocated to Producer attributable to the Excess Gas Lift Gas; and
B = the price that Buyer pays to Producer for the purchase of Producer's share of Residue Gas hereunder, as set forth in Section 2.01 of the Contract between Buyer and Producer.

GL-AIC
030114

C = the quantity of Plant Products allocated to Producer attributable to the Excess Gas Lift Gas; and
D = the price that Buyer pays to Producer for the purchase of Plant Products, as set forth in Section 2.01 of the Contract.

The Contract is amended to the extent noted herein.  In all other respects, it is confirmed and shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Gas Lift Amendment as of the date set forth above.

**BUYER:**
**REGENCY FIELD SERVICES LLC**
By: **Regency Gas Services LP, its sole member**
By: **Regency OLP GP LLC, its general partner**

By: _____
Name:   Jim S. Holotik
Title:    Vice President

**PRODUCER:**
**ARABELLA PETROLEUM COMPANY, LLC**

By: _____
Name: _____
Title: _____

CRP
091512



**REGENCY**
ENERGY PARTNERS

2001 Bryan Street
Suite 3700
Dallas, TX 75201
MAIN  214.750.1771
FAX    214.750.1749
www.regencyenergy.com

March 9, 2015

Clayton Williams Energy, Inc.
6 Desta Drive, Suite 6500
Midland, TX 79705

Re:     Central Receipt Point (CRP) Allocation Agreement
        For Gas Purchase Contract dated July 1, 2011
        Between Regency Field Services LLC, (Buyer), and
        Clayton Williams Energy, Inc. (Seller), (the Contract)
        Regency Contract Number 01P242

Gentlemen:

Buyer and Seller are parties to the Contract covering gas that flows into Regency's pipeline through one (1) or more Central Receipt Points (CRP) operated by Clayton Williams Pipeline Corporation (Operator), as described on the attached Exhibit A.  To the extent that any provisions of this CRP Allocation Agreement conflict with provisions in the Contract, the parties hereby amend the Contract to be consistent with this CRP Allocation Agreement.

In order to properly allocate gas delivered to Buyer at the CRPs, Buyer, Seller and Operator agree as follows:

1.   This Agreement relates to the CPR described on the attached Exhibit A.

2.   Seller authorizes Operator to provide Buyer with the volume of gas attributable to Seller's and other party's interests that is received by Buyer at the subject CRP (Volume Report).

3.   Operator agrees to provide the Volume Report to Buyer and Seller on or before the tenth (10th) day of each month for gas that flowed during the previous month.  The Volume Report will include Seller's and other party's entitlement at the subject CRP in Mcf and MMBtu, and Buyer's meter number for the CRP. The Volume Report will be sent to Regency by email to Tyson.Coon@regencygas.com.

CRP
091512

4.  Seller authorizes Buyer to use the Volume Report as the basis for determining the source of gas received at the subject CPR under the Contract. If the Volume Report is not received by Buyer by the tenth (10th) day of the month following the production month, Seller and Operator agree that allocations will be based on the last information provided to Buyer. Buyer is not obligated to make retroactive adjustments to allocations if Operator fails to provide timely or accurate allocation information to Buyer.

5.  Buyer retains the right to audit Operator's charts during normal business hours upon written request.

6.  Operator and Seller agree to indemnify and hold Buyer harmless from any claims that arise out of or in connection with Operator's performance under this CRP Allocation Agreement, including, but not limited to, any dispute that may arise regarding Buyer's allocation of gas based on the information provided to Buyer by Operator.

7.  This CRP Allocation Agreement may be executed in multiple counterparts, each of which shall constitute an original, and it shall be binding upon, and shall inure to the benefit of each party's heirs, devisees, legal representatives, successors and assigns.

8.  This CRP Allocation Agreement is effective February 1, 2015.

**BUYER**
**REGENCY FIELD SERVICES LLC**
By: Regency Gas Services LP, its sole member
By: Regency OLP GP LLC, its general partner

By: _Mary Ann McMichael_
Mary Ann McMichael
Director, Contract Administration

**SELLER**
**CLAYTON WILLIAMS ENERGY, INC.**

By: _Robert C. Lyon_

Name: Robert C. Lyon

Title:  Vice President

**OPERATOR**
**CLAYTON WILLIAMS PIPELINE CORPORATION**

By: _Robert C. Lyon_

Name: Robert C. Lyon

Title:  Vice President

CRP
091512

## EXHIBIT A

This Exhibit A is attached to and made part of that certain CRP Allocation Agreement dated March 9, 2015.

| CRP | Meter Number | Location |
|-----|--------------|----------|
| CWEI-CHK 20-54-7 | 80380 | Section 20, Block 54 T7S, Reeves, Texas |

**SELLERS/SHIPPERS BEHIND the CRP:**
Arabella Petroleum Company, LLC
Clayton Williams Energy, Inc.

3