AD GATH-WAHA-AE
011513

# GAS GATHERING AGREEMENT

## DATED JUNE 1, 2013

### BETWEEN

### REGENCY FIELD SERVICES LLC
### (GATHERER)

### AND

### ARABELLA PETROLEUM COMPANY, LLC

### (PRODUCER)

**EXHIBIT B**

AD GATH-WAHA-AE
011513

# GAS GATHERING AGREEMENT

**THIS AGREEMENT** (Agreement) is entered on this 1st day of June, 2013, between **Regency Field Services LLC (Gatherer)**, and **Arabella Petroleum Company, LLC (Producer)**.

## RECITALS

Producer desires to dedicate Leases and/or Wells as listed on **Exhibit "A"** and all Subsequent Well(s) completed for production within a Dedicated Area to Gatherer hereunder and to have its Gas gathered from the Receipt Point(s) to the Delivery Point(s) as set forth in this Agreement.

## ARTICLE I
## DEFINITIONS

1.      **British thermal unit** or **Btu** means the amount of heat required to raise the temperature of one avoirdupois pound of pure water from fifty-eight and five-tenths degrees (58.5°) Fahrenheit to fifty-nine and five-tenths degrees (59.5°) Fahrenheit.

2.      **Day, day** or **Daily** means a period of twenty-four (24) consecutive hours, beginning and ending at 9:00 a.m. Central Time; provided, that on the Day on which Daylight Saving Time becomes effective, the period will be twenty-three (23) consecutive hours; and on the Day on which Standard Time becomes effective, the period will be twenty-five (25) consecutive hours.

3.      **Dedicated Area** means the lands described and depicted by plat on **Exhibit "A-1"** and shall include the lease holdings and wells within the Dedicated Area either now owned or hereinafter acquired.

4.      **Fuel** means (i) Gathering Fuel, (ii) Plant Fuel, (iii) Gas used to operate Gatherer's system and Plant(s) and (iv) Gas lost and unaccounted for on Gatherer's system and Plant(s), including fuel equivalents (electricity or other energy sources converted to their Btu equivalent).

5.      **Gas** or **gas** means natural gas as produced in its natural state, including all of the hydrocarbon constituents thereof.

6.      **Gathering Fuel** means the Producer's share of Fuel to cause Gas to be gathered from the Receipt Point(s) and delivered to the Delivery Point(s) on Gatherer's system.

AD GATH-WAHA-AE
011513

7.    **GPA** means Gas Processors Association.

8.    **Gross Heating Value** means the number of Btu produced by the complete combustion of a cubic foot of Gas (excluding hydrogen sulfide) at a temperature base of sixty degrees (60 °) Fahrenheit and a pressure base of fourteen and seventy-three one hundredths (14.73) Psia. Heating values shall be expressed in Btu per cubic foot and may be determined by calorimeter, calculation from compositional analysis or other acceptable industry practices and shall reflect the actual condition of the Gas on delivery as adjusted for pressure, water content, and compressibility unless otherwise prescribed by statute. For the purpose of making Btu calculations, Gas dehydrated to a water content not exceeding seven (7) pounds per MMcf shall be considered dry. Gas having water content in excess of seven (7) pounds per MMcf shall be considered saturated at the delivery conditions of pressure and temperature.

9.    **Inferior Liquids** means mixed crude oil, slop oil, salt water, nuisance liquids, and other liquids recovered by Gatherer in its gathering system or at plant inlet receivers.

10.   **Lease(s)** means any lease, mineral interest, working interest, net profit interest and royalty or overriding royalty (where Producer has the right to direct delivery of gas thereunder), fee right, mineral servitude, license, concession or other right covering oil, gas and related hydrocarbons or an undivided interest therein or portion thereof and any and all of Producer's rights or interests now owned or hereafter acquired therein, along with rights to drill for, produce and dispose of oil, gas and liquid hydrocarbons or other substances, in and under the properties committed to this Agreement.

11.   **Maximum Pressure** means a maximum operating pressure at each Receipt Point that is directly connected to Gatherer's gathering system and as listed on **Exhibit "B"** hereto.  Gatherer in its sole discretion may elect to reduce the Maximum Pressure at any Receipt Point and will notify Producer by amendment of **Exhibit "B."**

12.   **Mcf** means one thousand (1,000) cubic feet of gas at a base temperature of sixty degrees (60°) Fahrenheit, and at a pressure base of fourteen and seventy-three one-hundredths (14.73) Psia and containing the amount of water vapor present at actual production pressure and temperature.

13.   **Minimum Production** means actual deliveries of Gas measured from a Receipt Point that are at least six hundred (600) Mcf per month, excluding the first month of connection.

14.   **MMBtu** means one million (1,000,000) British thermal units.

AD GATH-WAHA-AE
011513

15.     **Month** means the period beginning at 9:00 a.m. Central Time on the first Day of each calendar Month and ending at 9:00 a.m. Central Time on the first Day of the next succeeding calendar Month.

16.     **Non-conforming Gas** means any Gas delivered by Producer to Gatherer at any Receipt Point that fails to meet the quality specifications set forth herein.

17.     **Plant(s)** means any processing plant(s) for the extraction of Products from gas at which Gatherer now or hereafter processes Gas covered under this Agreement.  It is the intent that Gatherer shall have the continuing right to cause Gas to be processed in any processing plant, whether or not owned by Gatherer or its affiliates, but in a manner consistent with the terms of the Agreement.

18.     **Plant Fuel** means Producer's share of Fuel utilized by the processing facility.

19.     **Plant Products** or **Products** means those natural gas liquids, including ethane, propane, butane, and natural gasoline, and mixtures thereof, that are removed from Producer's Gas stream in the liquid extraction process at a natural gas processing facility and delivered as natural gas liquids from such facility.  The term Plant Products excludes any distillates, condensate or liquids, which accumulate in the drips, lines and separators downstream of the Receipt Point(s) or at Plant inlet receivers and Gatherer will own, retain and have the sole right to the proceeds from the sale of such distillates, condensate or liquids.

20.     **Process Shrinkage** means the MMBtu of the Products that are extracted and recovered during processing.

21.     **Psia** means pounds per square inch absolute.

22.     **Psig** means pounds per square inch gauge.

23.     **Residue Gas** means that portion of the Gas remaining and available after the extraction of Plant Products, and after deducting volumes for Fuel.

24.     **Subsequent Well** means any Well on the Leases that is completed for production subsequent to the date of this Agreement.

25.     **Unit of Volume** means for all purposes of measurement hereunder, one (1) cubic foot of gas at a temperature base of sixty degrees (60°) Fahrenheit and a pressure base of fourteen and seventy-three one-hundredths (14.73) Psia.

26.     **Well(s)** means Producer's interest in any well in the Dedicated Area that is now completed or may be hereafter completed.

AD GATH-WAHA-AE
011513

27.　　**Year** or **year** means a period of three hundred sixty-five (365) consecutive Days; provided, that any year that contains a date of February 29 will consist of three hundred sixty-six (366) consecutive Days.

## ARTICLE II
## DEDICATION AND QUANTITY

1.　　**Dedication.**  Producer dedicates and commits to this Agreement all of the Leases and Wells, including the Gas produced therefrom, located within the boundaries of the Dedicated Area.  Any transfer of any interest in the Leases, Wells, or the Gas shall be subject to Gatherer's rights under this Agreement.  Except as otherwise allowed under this Agreement, Producer shall not deliver Gas to any party other than Gatherer.  Producer shall deliver such quantities of Gas from each Well up to the maximum flow rate of such Well.  This covenant shall be a covenant attaching to and running with the Leases and the Wells and shall be binding on the successors and assigns of Producer and any interest of Producer in the Leases and the Wells.

2.　　**Gathering Quantity.**  Except as otherwise allowed under this Agreement, Producer will deliver each Day to Gatherer at the Receipt Point(s) all Gas produced from the Leases and Wells.  Subject to the operating conditions and capacity of Gatherer's gathering facilities, Gatherer agrees to receive the Gas, at pressures not to exceed the Maximum Pressure, and to deliver thermally equivalent quantities, less Fuel and Process Shrinkage, to the Delivery Point(s).  Producer shall use commercially reasonable efforts to deliver Gas to Gatherer at uniform rates of flow.  Gatherer will use commercially reasonable efforts to take Producer's quantities of Gas and operate its facilities in an effort to maintain consistent takes of all available quantities of Gas.

3.　　**Reservations of Producer.**  Producer reserves the following rights under this Agreement:

　　　(a)　　to pool or unitize the Leases with other leases in the same field, <u>provided</u> that all Gas attributable to Producer's interest in any unit so formed shall, to the extent of Producer's interest in the Leases, be deemed subject to this Agreement;

　　　(b)　　to use Gas above ground in developing and operating the Leases and for fulfilling obligations to the lessors under the Leases for domestic fuel;

　　　(c)　　to retain all liquid hydrocarbons separated from the Gas prior to the delivery to Gatherer by the use of conventional mechanical gas/oil field separators of the type in use, if any, as of the date of this Agreement; and

　　　(d)　　to retain all condensates, distillates, drip gas and Inferior Liquids that condense in Producer's system upstream of the Receipt Point(s).

4.　　**Reservations of Gatherer.**  Gatherer reserves the following rights under this Agreement:

AD GATH-WAHA-AE
011513

(a)     to own, retain, and have the sole right to the proceeds from any sale of all condensate, distillates, drip gas, and Inferior Liquids collected in Gatherer's, or its designee's pipelines downstream of the Receipt Point(s) or at Plant inlet receivers and Gatherer shall not allocate volumes or pay Producer for the proceeds from any such sales; and

(b)     to commingle Producer's Gas with other gas in Gatherer's system, and Gatherer shall have no obligation to deliver gas at the Delivery Point(s) that is of the same or similar quality as that received at the Receipt Point(s); and

(c)     to cease taking deliveries of Gas so long as Gatherer, in its sole opinion, determines that a dangerous or unsafe condition exists. Upon Gatherer's giving notice of any such cessation (and continuing until such condition is remedied to Gatherer's satisfaction), Gatherer shall not be obligated to accept delivery of Gas.

## ARTICLE III
## GATHERING FACILITIES

**1.**     **Facilities.**     Upon execution of this Agreement by the parties hereto, if required, Gatherer shall proceed with the final planning, design, acquisition of rights of way, and the construction of interconnect facilities required for Gatherer to receive Gas at the Receipt Point(s) and gather the Gas on Gatherer's system.

**2.**     **Subsequent Facilities.**     With regard to any Subsequent Well, Producer shall provide Gatherer with all necessary, available data to estimate the amount of recoverable gas reserves attributable to Producer's right to produce or market gas from such Well within thirty (30) days from the date of completion of the Well. Gatherer shall have the right, but not the obligation, to arrange for connection of the Subsequent Well to Gatherer's system, at Gatherer's expense, pursuant to the terms of this Agreement. In the event Gatherer elects to arrange for connection, the Subsequent Well shall be automatically added to this Agreement and **Exhibit "A"** shall be revised to reflect same. In the event Gatherer does not elect to arrange for connection of the Subsequent Well, Producer may construct, at Producer's expense, the facilities necessary to deliver the Gas from the Subsequent Well to Gatherer's existing pipeline system at a mutually agreeable location. If Producer constructs such facilities, Producer shall, upon Gatherer's written request, reimburse Gatherer for one hundred percent (100%) of the cost of installing measurement facilities at the Receipt Point into Gatherer's system. If neither party connects the Subsequent Well, it shall be released from this Agreement, as to any and all intervals then completed for production, upon written request from Producer to Gatherer.

## ARTICLE IV
## RECEIPT POINT(S), DELIVERY POINT(S) AND FACILITIES

AD GATH-WAHA-AE
011513

1.    **Receipt Point(s).**    The ("**Receipt Point(s)**") shall be at the inlet of Gatherer's facilities at or near the Well(s) as listed on **Exhibit "A,"** or at a location as otherwise mutually agreed upon.

2.    **Delivery Point(s).**    The ("**Delivery Point(s)**") for Gas gathered hereunder shall be at the outlet of Gatherer's facilities at the point(s) of interconnection as listed on **Exhibit "C."**

3.    **Maintenance of Facilities.**    Gatherer agrees to maintain its facilities for any Receipt Point that provides Minimum Production. If the actual deliveries measured for such Receipt Point should total less than the Minimum Production, Gatherer shall have the option to either (i) disconnect and remove its facilities from the Receipt Point and release each Well upstream of such Receipt Point as to the then producing interval, from this Agreement, (ii) connect and receive the Gas from such Well at a different Receipt Point at Producer's cost, or (iii) continue to maintain such Receipt Point and charge Producer a mutually agreeable fee per month.

4.    **Rights-of-Way.**    To the maximum extent that it may lawfully do so, Producer hereby assigns and grants, and will assign and grant any subsequent rights acquired, to Gatherer an easement and right-of-way upon all lands covered by the Leases, for the purpose of installing, using, maintaining, servicing, inspecting, repairing, operating, replacing, disconnecting and removing Gatherer's pipelines, meters and other equipment used or useful in the performance of this Agreement. Any property of Gatherer placed in or upon the Leases shall remain the personal property of Gatherer and may be disconnected and removed by Gatherer at any time for any reason. Producer shall at its expense maintain and provide all such easements, rights-of-way, lease roads and other access facilities upon the Leases as may reasonably be deemed necessary by Gatherer for its performance of this Agreement.

## ARTICLE V
## COMPENSATION AND DISPOSITION

1.    **Fees.**    For all Gas received by Gatherer at the Receipt Point(s), Producer will pay Gatherer the applicable fee(s) multiplied by the Mcf or MMBtu as set forth in **Exhibit "B."** If Gatherer determines that additional services are required in order for Gatherer to receive, deliver, treat, dehydrate, process or otherwise condition or conform the Gas, then Producer will pay a fee to Gatherer for such services for all Gas received by Gatherer at the Receipt Point(s) to be mutually agreed between the parties.

2.    **Adjustments to Fee(s).**    The Fees as defined in **Exhibit "B,"** may be adjusted by Gatherer, beginning on January 1st of the second calendar year following the date of this Agreement and each January 1st thereafter (Fee Escalation Date). The Fees in effect on the Fee Escalation Date shall be multiplied by a fraction, the numerator of which is the

AD GATH-WAHA-AE
011513

Consumer Price Index, All Urban Consumers, U. S. City Average, All Items, as published by the U. S. Department of Labor, Bureau of Labor Statistics (CPI-U), or its most comparable successor, for the month of December of the year immediately preceding the Fee Escalation Date and the denominator of which is the CPI-U for the month of January of the year immediately preceding the Fee Escalation Date. However, in no event shall the Fees be less than the Fees on this **Exhibit "B"** as of the date of this Agreement.

3.      **Fuel.**  In addition to the other amounts payable under this Agreement, Producer shall furnish to Gatherer, at Producer's sole cost and expense, the Gathering Fuel retention volumes as set forth in **Exhibit "B"** and the Plant Fuel retention volumes as set forth in **Exhibit "D."**

4.      **Processing.**  Producer's share of Residue Gas and Plant Products associated with any processing agreed to by the parties is set forth on **Exhibit "D."**  Unless otherwise stated on **Exhibit "D,"** Producer's share of Residue Gas shall be made available to the Producer, or for its account, at the active tailgate outlets for gas at the Plant, as determined and made available by the operator of the Plant.

## ARTICLE VI
## RECEIPT AND DELIVERY PRESSURES AND RATE OF FLOW

1.      **Pressure.**  Producer shall deliver, or cause to be delivered, to Gatherer the Gas to be gathered at the line pressures existing in Gatherer's system as such pressure may exist from time to time, not to exceed the Maximum Pressure. Producer shall install, operate and maintain, at its sole expense, such pressure regulating devices as may be necessary to regulate the pressure of gas prior to delivery to Gatherer so as not to exceed the Maximum Pressure.  If Producer fails to regulate such pressure upon execution of this Agreement or upon the installation of new connection facilities for Subsequent Wells, then Gatherer may install such pressure regulating devices on Gatherer's facilities at the Receipt Point(s) upstream of the measurement device.  Notwithstanding anything in this Agreement to the contrary, if Gatherer installs such pressure regulating devices and they are triggered due to Producer's failure to regulate the pressure at the Receipt Point(s) as required, then Producer is responsible for any loss of gas or any emissions of the gas stream from the pressure regulating devices and any damage to persons, property or the environment, and the violation of any laws, rules or regulations caused by such release on Gatherer's facilities.  Notwithstanding the provisions in the Article titled, "Warranties and Indemnification," regarding Gatherer's indemnification of Producer, Producer will fully indemnify, defend and hold Gatherer harmless for any such losses, emissions, damages or violations.

If Gatherer's operating pressures should exceed the Maximum Pressure for a period of ten (10) days during any three month consecutive period at a Receipt Point, excluding

AD GATH-WAHA-AE
011513

events of force majeure, Producer shall have the right to notify Gatherer in writing of such occurrence (**"Pressure Notice"**) within ninety (90) days of such occurrence. Upon receipt of Producer's Pressure Notice, Gatherer shall attempt to address any operational issues to again provide Producer with pressures not to exceed the Maximum Pressure.

Should Gatherer fail to reduce pressures to levels at or below the Maximum Pressure within sixty (60) days of receipt of Producer's Pressure Notice, Producer shall have the right to a release from this Agreement of those Well(s) behind such Receipt Point if written notice is given to Gatherer following such sixty (60) day period.

If Gatherer's only curative measure to maintain the Maximum Pressure requires Gatherer to install additional compression and/or install additional pipelines, Gatherer may provide Producer written notice, within the sixty (60) day period following Producer's Pressure Notice, of Gatherer's good faith intention to install such additional compression or pipelines and Producer's right to terminate shall be suspended for the reasonable amount of time required to complete pipeline and/or compression facilities. Gatherer shall proceed with such facilities as expeditiously as reasonably possible.

2. **Third-Party Gatherers and Pipelines.** Producer shall make, or cause to be made, all necessary arrangements with other pipelines or parties at or upstream of the Receipt Point(s) and at or downstream of the Delivery Point(s) in order to effectuate Gatherer's receipt and delivery of Gas. Such arrangements must be coordinated with Gatherer's gas control or gas scheduling department and must be acceptable to Gatherer in its reasonable discretion.

### ARTICLE VII
### NOMINATIONS AND IMBALANCES

1. **Nominations.** Nominations are to be submitted by Producer to the attention of Gatherer's gas scheduling department in writing, by fax or other electronic means designated by Gatherer by 11:30 a.m. Central Time on the Day before Gas is to flow. The nominations shall cite the aggregate volume of Gas, adjusted for Fuel and Process Shrinkage, as applicable, to be delivered by Producer at the Receipt Point(s) for redelivery by Gatherer at specified Delivery Point(s), all in accordance with Gatherer's then current nomination procedure. Gatherer shall confirm the scheduled quantity in writing to Producer by 3:00 p.m. Central Time on the Day the nomination is made.

2. **Imbalances.** The term **"Imbalance"** means the cumulative difference in a Month between: (i) the quantity of Gas in MMBtu received for the account of Producer at the Receipt Point(s), less Producer's Fuel and Process Shrinkage retention quantity, as applicable, and (ii) the quantity of Gas in MMBtu delivered for the account of Producer at the Delivery Point(s). After any adjustment for Fuel and Process Shrinkage, if the Imbalance is the result of receipts at the Receipt Point(s) exceeding the delivered (or scheduled, as applicable) quantity of Gas for Producer's account at the Delivery Point(s),

AD GATH-WAHA-AE
011513

it is a "**Positive Imbalance.**" If the Imbalance is the result of receipts at the Receipt Point(s) being lower than the delivered quantity of Gas for Producer's account at the Delivery Point(s), it is a "**Negative Imbalance.**" Imbalances will be cashed out on a Monthly basis.

3.   <u>**Cash Out.**</u>   The cash-out settlement price will be the monthly arithmetical average of the prices ("**Cash-Out Price**") received by Gatherer for sales at the Delivery Point(s) made on a daily basis. Gatherer will pay Producer an amount that is the product of the Positive Imbalance each Month, if any, and the Cash-Out Price. Producer will pay Gatherer an amount that is the product of the Negative Imbalance each Month, if any, and the Cash-Out Price. If the actual monthly volume varies by more than five percent (5%) from the delivered volumes for the Month, then the Cash-Out Price will be adjusted as follows:

1) For Negative Imbalances, the Cash-Out Price will be increased by the percentage variance, rounded up to the nearest whole percentage point, between the Delivery Point volumes and the adjusted Receipt Point volumes. (i.e., if the adjusted receipt volume from Producer is 7% less than the Delivery Point volume, then the Cash-Out Price will be increased by 7%); and

2) For Positive Imbalances, the Cash-Out Price will be decreased by the percentage variance, rounded up to the nearest whole percentage point, between the Delivery Point volumes and the adjusted Receipt Point volumes. (i.e., if the adjusted receipt volume from Producer is 7% greater than the Delivery Point volume, then the Cash-Out Price will be decreased by 7%).

Gatherer shall notify Producer as soon as reasonably practicable: (i) if there is a force majeure event that materially affects Gatherer's ability to accept Producer's Gas for forty-eight (48) hours or more, and (ii) to the extent Gatherer has information as to the duration of such event, Gatherer shall provide Producer that information and updates to such information.

## ARTICLE VIII
## MEASUREMENT

1.   <u>**General.**</u>   For billing and payment purposes, the Gas received and delivered hereunder shall be measured by metering facilities installed, operated and maintained by Gatherer or its designee. Such measurement stations are to be equipped with orifice meters or linear meters, electronic flow meters (EFM), and samplers (spot samplers, composite samplers, or online Gas chromatograph) commonly accepted by the industry sufficient to accomplish the accurate measurement of Gas; <u>provided</u>, that Gatherer has the right within its sole discretion (at its sole expense) to upgrade to or utilize more modern devices that meet industry standards.

2.   <u>**Procedure.**</u> The measurement of Gas at Receipt Point(s) or Delivery Point(s) will be conducted in accordance with the following:

AD GATH-WAHA-AE
011513

(a)    Gatherer may determine a local atmospheric pressure from published local data, by calculating from a local elevation, or may assume the atmospheric pressure to be 14.7 Psia. Whenever conditions of temperature and pressure differ from such standard, conversion of the volume of Gas from such conditions to the standard conditions will be made in accordance with the Ideal Gas Laws corrected for deviation of the Gas from Boyle's Law in accordance with the methods and formulae prescribed in the American Gas Association Report No. 8, <u>Compressibility Factors of Natural Gas and Other Hydrocarbon Gases,</u> as last amended and superseded.

(b)    Measurement, both volumetric and thermal, will be computed in accordance with the latest publications of the American Gas Association including AGA Report #3, AGA Report #7 and AGA Report #9 in conjunction with the American National Standard publication, <u>Orifice Metering of Natural Gas,</u> ANSI/API 2530, latest revision.

(c)    The specific gravity of the Gas will be determined at the point(s) of measurement by one of the following methods, at the option of Gatherer: (1) an on-line chromatograph, (2) continuous sampling, or (3) spot sampling.

(d)    At Gatherer's option, Gross Heating Value of the Gas shall be determined at each point(s) of measurement hereunder: (1) by an online chromatograph, (2) by composite samples, or (3) by spot samples, taken by Gatherer or its nominee by application of the methods contained in API/GPA standards and in such amendments and revisions thereto and superseding reports thereof as recommended by the API/GPA committee. Spot sampling frequency shall be determined based upon the monthly flow rate at the Receipt Point as follows:

      (i) between 0 to 15,000 MMBtu per Month, samples shall be taken semi-annually;

      (ii) between 15,001 to 60,000 MMBtu per Month, samples shall be taken on a quarterly basis; or

      (iii) greater than 60,000 MMBtu per Month samples shall be taken monthly.

For composite samples, each sample shall be taken on a monthly basis.

The Gross Heating Value will be converted to the same condition stipulated for the Unit of Volume. The physical constants used in Btu computation for a perfect Gas will be derived from the "Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds" as published in the GPA Standard 2145-03 and superseding revisions thereof. The analysis will be complete and individual values in mol percent or fraction of each hydrocarbon compound will be listed through $C_6$. The $C_6+$ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Gatherer's option, by use of an extended analysis. The analysis will further include the mol fraction or percent individually of

AD GATH-WAHA-AE
011513

additional compounds contained in chromatographically measurable quantity contained in the sample.  The method to be used for chromatographic analysis will be that contained in GPA standard 2261, <u>Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography</u> and any superseding revisions thereof.

(e)     Upon mutual agreement of the parties, other types of Btu per cubic foot measuring devices may be installed and operated and the Gross Heating Value will be computed in accordance with the manufacturer's instructions for same and consistent with industry-accepted practices for transmission Btu per cubic foot measurement.

(f)     Gas samples taken from the pipeline system for purposes of determining or deriving quantitative values that will be used in the computation of Gas volume and the Gross Heating Value will be obtained through use of a probe to be inserted sufficiently beyond the periphery of the internal pipe walls to assure that the Gas being drawn for the sample is free of any liquid accumulation from the internal pipe wall.

(g)     If any standards or methods for calculations or determinations set forth in any applicable GPA publications are revised, and if both parties are in agreement with said revision, then this Agreement will be amended accordingly.

(h)     Gatherer will install, own, operate and maintain standard type measuring and testing equipment necessary to measure and test Gas transported hereunder and will keep same accurate and in good repair. Furthermore, any measurement equipment installed subsequent to the date of this Agreement shall meet the then most current industry standards.  Gatherer's EFM equipment, if installed, will be tested not less than once a year for accuracy.  Data editing, calibrations, repairs and adjustments of Gatherer's measuring and testing equipment will be done only by employees of Gatherer or its designated representatives.   All analyzing may be witnessed by Producer.   Producer or its designated representative may, in the presence of an employee of Gatherer or Gatherer's designated representative, have access to Gatherer's measuring and analyzing equipment at any reasonable time, and will have the right to witness tests, calibrations and adjustments thereof.   All tests scheduled hereunder will be preceded by reasonable notice to Producer.   Upon request of either party hereto for a special test of any meter or auxiliary equipment, Gatherer will promptly verify the accuracy of same; <u>provided</u>, that the cost of such special test will be borne by the requesting party, unless the percentage of inaccuracy found is more than two percent (2%) of a recording corresponding to the average hourly rate of Gas flow.

If, upon any test, any measuring equipment is found to be inaccurate, such inaccuracy will be taken into account in a practical manner in computing the deliveries.  If the resultant aggregate inaccuracy in the computed receipts is not more than two percent (2%) of a recording corresponding to the average hourly rate of Gas flow for the period since the last preceding test, previously calculated receipts will be deemed accurate.  All equipment will, in any case, be adjusted at

AD GATH-WAHA-AE
011513

the time of test to record accurately. If, however, the resultant aggregate inaccuracy in computed receipts exceeds two percent (2%) of a recording corresponding to the average hourly rate of Gas flow for the period since the last preceding test, the previous recordings of such equipment will be corrected to zero error for any period that is known definitely or agreed upon. If the period is not known definitely or agreed upon, such correction shall be for a period extending back the lesser of (i) one-half of the time elapsed since the date of the last test or (ii) forty-five (45) Days.

(i)    If any meter or auxiliary equipment is out of service or out of repair for a period of time so that the amount of Gas delivered cannot be ascertained or computed from the reading thereof, the Gas delivered during such period will be estimated based on the best data available, using the first of the following methods that is feasible: (1) by using the registration of any check meter or meters, if installed and accurately registering, (2) by correcting the error if the percentage of error is ascertainable by calibration tests or mathematical calculations, (3) by estimating Gas volumes on the basis of deliveries during the preceding periods under similar conditions when the equipment was registering accurately, or (4) by other method(s) mutually acceptable to both parties.

(j)    Upon request of Producer and if EFM is installed, Gatherer will provide an electronic measurement audit package that complies with *API Chapter 21.1 Measurement* to Producer for examination, the same to be returned within thirty (30) Days. Gatherer's measurement audit package for a given accounting month will be deemed correct if no written objection thereto is served on either party by the other within the Year following any Month, but the same shall be retained for a two (2) Year period. If measurement is provided with a chart recorder, then Producer will be entitled to review the original measurement records at Gatherer's premises during normal business hours.

(k)    Producer may install, operate and maintain, at its sole cost, risk and expense, but in the same manner as is required for Gatherer's equipment hereunder, check measuring and testing equipment of standard type; provided, that the same does not interfere with the operation of Gatherer's equipment. The measurement and testing of Gas hereunder or for purposes of the Agreement will, nevertheless, be effected only by Gatherer's equipment, except as provided in (j) above. Gatherer will have the same rights with respect to said check metering and testing equipment of Producer as are granted to Producer with respect to Gatherer's metering and testing equipment.

(l)    If it is determined prior to, or as a result of, in-service tests, experience and observation by either Producer or Gatherer that pulsations exist that affect the measurement accuracy, the operator of the facilities agrees to install and operate mechanical dampening equipment necessary to eliminate such pulsations.

(m)    If at any time during the term of this Agreement a new method or technique is developed with respect to Gas measurement or the determination of the factors

AD GATH-WAHA-AE
011513

used in such Gas measurement, such new method or technique may be substituted for the method set forth in this Section when, upon agreement of both parties, employing such new method or technique is advisable.

(n)     No corrections shall be made for measurement or testing inaccuracies of two percent (2%) or less.

## ARTICLE IX
## QUALITY

1.     **Receipt Point Specifications.**  The Gas received at each Receipt Point shall meet the following quality specifications:

(a)     <u>Oxygen</u> - not to exceed ten (10) parts per million (PPM) of uncombined oxygen, and Producer shall make reasonable efforts to maintain the Gas free from oxygen;

(b)     <u>Hydrogen Sulfide</u> - not to exceed 4 PPM;

(c)     <u>Sulfur</u> – not to exceed five (5) grains per one hundred (100) cubic feet;

(d)     <u>Carbon Dioxide</u> - not to exceed two percent (2%) by volume;

(e)     <u>Liquids</u> - the Gas shall be free of water and other objectionable liquids at the temperature and pressure at which the Gas is received;

(f)     <u>Dust, Gums and Solid Matter</u> - be commercially free of dust, gums, gum forming constituents, and other media or solid matter;

(g)     <u>Temperature</u> - have a temperature of not less than forty degrees ($40°$) Fahrenheit and not more than one hundred twenty degrees ($120°$) Fahrenheit;

(h)     <u>Nitrogen</u> - not to exceed two percent (2%) by volume;

(i)     <u>Other</u> - not to exceed four percent (4%) by volume of total non-hydrocarbon gases;

(j)     <u>Heating Value</u> - contain a Gross Heating Value of at least nine hundred fifty (950) Btu per cubic foot; and

(k)     <u>Hazardous Waste</u> - not contain corrosion inhibitors, chemicals, antifreeze agents, hazardous waste as defined in the Resources Conservation and Recovery Act of 1976 or other materials containing constituents harmful or injurious to Gatherer's operations

AD GATH-WAHA-AE
011513

**2.** **Delivery Point Specifications.** The Gas delivered by Gatherer at the Delivery Point(s) shall meet the minimum quality specifications of the receiving pipeline that are in place as of the date of this Agreement.

**3.** **Non-conforming Gas.** If any Gas delivered by Producer is Non-conforming Gas, Gatherer may refuse to accept delivery of such Non-conforming Gas until Producer has corrected the quality deficiency. Gatherer's option to refuse delivery of Non-conforming Gas is in addition to other remedies available to Gatherer. If Gatherer at any time accepts delivery of Non-conforming Gas, such acceptance will not constitute a waiver of this provision with respect to any future delivery of Gas, and Producer will indemnify Gatherer for any costs, expenses, losses, damages and liabilities arising out of such accepted Non-conforming Gas. Notwithstanding any provisions herein to the contrary, if Producer's Non-conforming Gas is delivered into Gatherer's pipeline without the prior knowledge or approval of Gatherer and the quality deficiency of that Gas damages any party's pipeline or appurtenant facilities, Producer will reimburse Gatherer for all damages caused or to the extent contributed to by Producer's Non-conforming Gas, including without limitation physical damage to any pipeline or appurtenant facilities and economic damage to Gatherer's commercial operations.

**4.** **Receiving Pipeline with More Stringent Quality Specifications.** Notwithstanding the foregoing provisions of Section 2 above, if the quality specifications of the receiving pipeline at the Delivery Point(s) are more stringent than those in place as of the date of this Agreement, Gatherer is not required to accept at the Receipt Point(s) nor redeliver at the Delivery Point(s) any Gas tendered by Producer for gathering hereunder to such points, until Producer conforms the Gas to such specifications. Gatherer shall also have the right to conform Producer's Gas to meet the more stringent specifications of the receiving pipeline and charge Producer a fee, as mutually agreed to by the parties.

**ARTICLE X**
**STATEMENTS, BILLINGS AND PAYMENTS**

**1.** **Statements.** On or before the twenty-fifth (25th) Day of each Month, Gatherer shall deliver to Producer a statement or invoice for the Gas delivered during the preceding Month that includes any fees, charges, Fuel and Imbalance charges. If the actual quantity delivered is not available, the statement will be prepared based upon estimates. Gatherer shall make appropriate adjustments to reflect the actual quantity delivered on the following Month's statement or as soon thereafter as actual delivery information is available.

**2.** **Payment Method.** Producer or Gatherer will pay by wire transfer, check or ACH transfer to the account or remittance address set forth herein or according to the instructions set forth in the applicable statement or invoice, the full amount payable according to such statement, on the later of: (a) the last Day (or the next business Day if the last day is on a weekend or bank holiday) of the month following the month of delivery of the Gas, or (b) on or before ten (10) Days following receipt of such invoice by

AD GATH-WAHA-AE
011513

Producer.  Gatherer may recover any overpayments or collect any amounts due from Producer to Gatherer for any reason at any time under this or other transactions by deducting them from any proceeds payable to Producer or its affiliates.

**3.**    **Taxes and Royalties.**  Producer will pay all severance, production, excise or similar taxes imposed or levied by the state or any other governmental entity on the Plant Products purchased hereunder, if any, and Producer shall remit such tax to the applicable governmental entity.  The price paid to Producer by Gatherer shall be inclusive of such tax.  Producer further agrees to reimburse Gatherer upon invoice for the full amount of any taxes or charges levied, assessed or fixed by any municipal or governmental authority against Gatherer or its business in connection with or attributable to the volumes, value or gross receipts from the gathering of the Gas received from Producer hereunder or against such Gas itself or the act, right or privilege of ownership, production, severance, handling, transmission, compression, treating, distribution, sale, delivery or redelivery of such Gas, whether such tax or charge is based upon the volume, value or gross receipts from the gathering of such Gas or upon some other basis.  Producer shall pay or cause to be paid any and all sums, including without limitation, royalties, overriding royalties, bonus payments, production payments, and the like accruing from the production and sale of Plant Products hereunder.

**4.**    **Creditworthiness.**  Should Gatherer have reasonable grounds for doubting the ability of Producer to perform its obligations hereunder, Gatherer shall have the right to request and receive from Producer adequate assurance of performance ("Performance Assurance") as provided herein.  Such Performance Assurance shall be due no later than ten (10) days after Gatherer's written request and shall take one of the following forms, at Producer's option: 1) an irrevocable letter of credit from an institution and in an amount acceptable to Gatherer, or 2) a guaranty from a creditworthy party.

**5.**    **Delinquent Payments.**  If Producer is delinquent in any undisputed payments hereunder, Gatherer may, upon five (5) days written notice, suspend service hereunder until all outstanding amounts are paid in full.  Gatherer shall have no liability to Producer for any such suspension of service.

**6.**    **Examination of Books and Records.**  Upon execution of a Confidentiality Agreement and except as limited herein, each party hereto, or its representative, has the right to examine the books and records of the other party to the extent necessary to verify the accuracy of any statement, charge, computation or demand made hereunder.  Any statement is final as to all parties unless questioned within two (2) years after the statement is issued.  No party shall be required to permit more than one audit of its books and records in any rolling twelve month period, and no party shall be required to permit an audit of books and records supporting a statement that is deemed final in accordance with the immediately preceding sentence.

AD GATH-WAHA-AE
011513

## ARTICLE XI
## TERM

**1.      Term.**   This Agreement is effective on the date first written above and shall continue in effect for a period of seven (7) years beginning with the first day of the month following the month in which gas first flows. ("**Primary Term**").   Following the Primary Term, this Agreement shall continue in effect on a year to year basis thereafter unless terminated by either Party providing at least ninety (90) days written notice prior to the expiration of the Primary Term or any subsequent year thereafter.   All indemnity obligations, confidentiality obligations, payment obligations and audit rights shall survive the termination or expiration hereof.

**2.      Effect of Governmental Action.**   It is understood that performance hereunder shall be subject to all valid rules and regulations of duly constituted governmental authorities having jurisdiction or control over the matters related hereto.   If, at any time during the term, any governmental authority shall take any action which is, with respect to or as a result of the gathering services provided for under this Agreement, designed to subject or otherwise subjects Gatherer or any of its gathering line(s) or related facilities to any greater or different regulation or jurisdiction than that existing on the date of initial delivery of Gas, or otherwise materially adversely affect Gatherer, then upon written notice given to Producer, Gatherer may cancel and terminate this Agreement effective one (1) day prior to the effective date of such governmental action.

**3.      Uneconomic Operations.**   Notwithstanding anything in this Agreement to the contrary, if the performance of Gatherer's obligations hereunder with respect to Gas received at any of the Receipt Point(s) becomes uneconomic to Gatherer in the exercise of Gatherer's reasonable judgment, Gatherer shall be under no obligation to accept delivery of such Gas.   Should Gatherer elect not to accept delivery of Gas under this provision for a period of thirty (30) consecutive days, if requested by Producer in writing, Gatherer will release from dedication to this Agreement the Well(s) flowing Gas to such Receipt Point(s).

## ARTICLE XII
## WARRANTIES AND INDEMNIFICATION

**1.      Warranty of Title.**   Producer warrants that it will at the time of delivery of Gas to Gatherer under this Agreement have good title to or good right to deliver all Gas so made available and that the Gas will be free and clear of all liens, encumbrances, and adverse claims of any kind.   If any claim is made on the title, Gatherer has the right to suspend receipt or deliveries of Gas hereunder until such issue is finally resolved to the satisfaction of Gatherer.

AD GATH-WAHA-AE
011513

2.     **Warranty of Eligibility for Gathering.** Producer warrants that all Gas delivered to Gatherer for gathering hereunder will be eligible for gathering by Gatherer under any applicable laws, rules, regulations or orders of any governmental authority having jurisdiction and that, at the time of such deliveries, Producer has complied with all provisions of this Agreement.

3.     **Additional Warranties.** Each of Producer and Gatherer represents and warrants to each other that on and as of the date hereof:

(a)     It is duly formed, validly existing and in good standing under the laws of its state of jurisdiction or formation, with power and authority to carry on the business in which it is engaged and to perform its respective obligations under this Agreement;

(b)     The execution and delivery of this Agreement by it have been duly authorized and approved by all requisite corporate, limited liability company, partnership or similar action;

(c)     It has all the requisite corporate, limited liability company, partnership or similar power and authority to enter into this Agreement and perform its obligations hereunder;

(d)     The execution and delivery of this Agreement does not, and consummation of the transactions contemplated herein will not, violate any of the provisions of organizational documents, any agreements pursuant to which it or its property is bound or, to its knowledge, any applicable Laws;

(e)     This Agreement is valid, binding and enforceable against it in accordance with its terms subject to bankruptcy, moratorium, insolvency and other Laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity); and

(f)     It is qualified to do business in the State(s) in which the subject Leases, Receipt Point(s) and Delivery Point(s) are located.

4.     **INDEMNIFICATION BY PRODUCER.** PRODUCER COVENANTS THAT IT WILL RELEASE, DEFEND, INDEMNIFY AND SAVE GATHERER HARMLESS FROM AND AGAINST ANY AND ALL SUITS, ACTIONS, CAUSES OF ACTION, CLAIMS, AND DEMANDS ARISING FROM OR OUT OF ANY ADVERSE CLAIMS MADE BY ANY THIRD PARTY OR BY PRODUCER FOR ANY LOSS, DAMAGE, COST OR EXPENSE RELATING TO, CAUSED BY, OR ARISING OUT OF: (i) PRODUCER'S OPERATION OF ITS FACILITIES, (ii) THE OWNERSHIP OF OR ANY INTEREST IN THE GAS TENDERED FOR GATHERING SERVICES HEREUNDER, (iii) THE QUALITY (OR LACK THEREOF) OF PRODUCER'S GAS, (iv) THE BREACH BY PRODUCER OF ANY REPRESENTATION OR WARRANTY MADE BY PRODUCER HEREUNDER, AND (v) THE LOSS OF OR DAMAGE TO

AD GATH-WAHA-AE
011513

PRODUCER'S GAS BEFORE GATHERER'S RECEIPT OF PRODUCER'S GAS
AND AFTER GATHERER'S DELIVERY OF PRODUCER'S GAS; PROVIDED
HOWEVER, THAT PRODUCER SHALL HAVE NO OBLIGATION TO INDEMNIFY
GATHERER AGAINST GATHERER'S OWN GROSS NEGLIGENCE OR WILLFUL
MISCONDUCT.

5.  **INDEMNIFICATION BY GATHERER.**  GATHERER COVENANTS THAT
IT WILL RELEASE, DEFEND, INDEMNIFY, AND SAVE PRODUCER HARMLESS
FROM AND AGAINST ANY AND ALL SUITS, ACTIONS, CAUSES OF ACTION,
CLAIMS, AND DEMANDS ARISING FROM OR OUT OF ANY ADVERSE CLAIMS
MADE BY ANY THIRD PARTY OR BY GATHERER FOR ANY LOSS, DAMAGE,
COST, OR EXPENSE RELATING TO, CAUSED BY, OR ARISING OUT OF (i)
GATHERER'S OPERATION OF ITS FACILITIES, (ii) THE BREACH BY
GATHERER OF ANY REPRESENTATION OR WARRANTY MADE BY
GATHERER HEREUNDER, AND (iii) THE LOSS OF OR DAMAGE TO
PRODUCER'S GAS AFTER GATHERER'S RECEIPT OF PRODUCER'S GAS AND
BEFORE GATHERER'S DELIVERY OF PRODUCER'S GAS TO PRODUCER OR
ITS DESIGNEE (EXCEPT AS SET FORTH IN THE ARTICLE "RECEIPT AND
DELIVERY PRESSURES AND RATE OF FLOW"); PROVIDED HOWEVER, THAT
GATHERER SHALL HAVE NO OBLIGATION TO INDEMNIFY PRODUCER
AGAINST PRODUCER'S OWN GROSS NEGLIGENCE OR WILLFUL
MISCONDUCT.

6.  **LIMITATION OF LIABILITY.**  EXCEPT AS PROVIDED IN THE NON-
CONFORMING GAS SECTION OF THE QUALITY ARTICLE HEREIN, IN NO
EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR
EXEMPLARY OR PUNITIVE DAMAGES OR ANY SPECIAL, INDIRECT,
INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY CHARACTER,
INCLUDING WITHOUT LIMITATION, LOSS OF USE, LOST PROFITS OR
REVENUES, COST OF CAPITAL, CANCELLATION OF PERMITS, UNABSORBED
TRANSPORTATION OR STORAGE CHARGES, TERMINATION OF CONTRACTS,
TORT OR CONTRACT CLAIMS (OTHER THAN CONTRACT CLAIMS ARISING
OUT OF AN AGREEMENT BETWEEN GATHERER AND PRODUCER), OR LOST
PRODUCTION, IRRESPECTIVE OF WHETHER CLAIMS FOR SUCH DAMAGES
ARE BASED UPON CONTRACT, WARRANTY, NEGLIGENCE, STRICT
LIABILITY OR OTHERWISE.  TO THE EXTENT NOT LIMITED OR WAIVED
HEREIN, EACH PARTY RESERVES TO ITSELF ALL RIGHTS, SET-OFFS,
COUNTERCLAIMS AND OTHER REMEDIES AND DEFENSES TO WHICH SUCH
PARTY MAY BE ENTITLED ARISING FROM THIS AGREEMENT.

### ARTICLE XIII
### POSSESSION, CONTROL AND TITLE PASSAGE

AD GATH-WAHA-AE
011513

1.  **Possession and Control**.  Producer shall be deemed to be in control and in possession of the Gas prior to such Gas being received by Gatherer and shall be responsible for any damages, losses or injuries caused thereby until the same shall have been received by Gatherer, except for injuries and damages which have been occasioned solely and proximately by the willful misconduct or negligence of Gatherer or its designee.  Gatherer shall be in control and in possession of the Gas subsequent to such Gas being received by Gatherer and shall be responsible for any damages, losses or injuries caused thereby until the same shall have been redelivered to Producer or its designee at the Delivery Point(s), except for injuries and damages that have been occasioned solely and proximately by the willful misconduct or negligence of Producer or its designee.

2.  **Title Passage.**  Producer shall retain title to the Plant Products delivered hereunder until they are extracted at the Plant and available for sale.  Title to the Plant Products shall pass to and vest in Gatherer at the Plant tailgate.  If Gatherer purchases the Residue Gas under a separate agreement between the Parties, title to the Residue Gas shall pass to and vest in Gatherer at the Delivery Point(s).

**ARTICLE XIV**
**FORCE MAJEURE**

If either party is rendered unable, wholly or in part, by any of the events or occurrences listed below (each of which shall constitute an event of *force majeure*), individually or in the aggregate, to perform or comply with any obligation or condition of this Agreement, such obligation or condition will be suspended during the continuance of the inability so caused and such party will be relieved of liability for damages stemming from any failure to perform the same during such period:

(a) Any cause not reasonably within the control of the affected party;

(b) Any act or omission by parties not controlled by the party having the difficulty;

(c) Acts of God or the public enemy, civil unrest or criminal activity;

(d) The elements (including but not limited to rain, hurricanes, floods, earthquakes, tornados, and freezing of wells or lines of pipe), or threats thereof;

(e) Fire, accidents, or breakdowns;

(f) Strikes and any other industrial, civil, or public disturbance;

(g) Failure of upstream or downstream pipelines to install facilities or to take or transport gas;

(h) Accidents, repairs, maintenance or alteration to lines of pipe or equipment;

(i) Inability to obtain rights-of-way, easements or property rights for the construction or operation of any necessary facilities hereunder on a commercially reasonable basis;

AD GATH-WAHA-AE
011513

(j) Inability to obtain materials, supplies, permits or labor;

(k) Temporary failure of gas supply;

(l) Failure of downstream transporters to adhere to contractual commitments to either party;

(m) Any laws, order, rules, regulations, acts or restraints of any government or governmental body or authority, civil or military.

Notwithstanding anything herein to the contrary, the obligation to make payments then due hereunder will not be suspended by an event of *force majeure*. The party suffering an event of *force majeure* shall give notice and reasonably full particulars to the other party as soon as reasonably possible upon the occurrence of such event. Nothing herein shall obligate either party to settle strikes or lockouts under terms that are unacceptable to the affected party. When an event of *force majeure* prevents normal gathering and processing operations for Producer's Gas, notwithstanding anything herein to the contrary, Gatherer may, in its sole discretion, allocate Plant Products actually recovered, saved and sold by Gatherer to each Receipt Point based on the ratio that the actual gallons of each hydrocarbon component recovered at the Plant bears to the total theoretical gallons of each hydrocarbon component available from all Gas delivered to the Plant from all receipt points (including Producer's Receipt Points) on Gatherer's system.

## ARTICLE XV
## NOTICES & PAYMENTS

Except as otherwise provided, any notice, request, statement, correspondence provided for in this Agreement, shall be given in writing, delivered in person or by United States mail, to the parties hereto at the addresses shown below or at such other addresses as may be hereafter furnished by one party to the other party in writing:

**Gatherer:**

**Notices:**
Regency Field Services LLC
2001 Bryan Street, Suite 3700
Dallas, TX 75201
Attn: Contract Administration
Phone: (214) 750-1771
Fax: (214) 750-1749

**Payments – Wire Transfer or ACH**:
Wells Fargo Bank, N. A.
ABA# 121000248 – for wire transfers
ABA # 053101561 – for ACH payments
Account # 2079900583559
Account name: Regency Field Services LLC

AD GATH-WAHA-AE
011513

**Payments: Check**
Regency Field Services LLC
P.O. Box 209034
Dallas, TX  75320-9034

**Producer:**        **Notices:**
Arabella Petroleum Company, LLC
500 W. Texas Ave., Suite 1450
Midland, TX  79701
Phone: (432) 897-4755
Fax: (800) 729-0160

**Payments:**
Arabella Petroleum Company, LLC
500 W. Texas Ave., Suite 1450
Midland, TX  79701

**TAX ID #:**
20-8435954

# ARTICLE XVI
## MISCELLANEOUS

1.    **Regulatory Bodies.**  This Agreement shall be subject to all valid applicable federal, state and local laws, rules and regulations of any governmental body or official having jurisdiction.  All parties hereto shall be entitled to treat all laws, orders, rules and regulations issued by any federal or state regulatory body as valid and may act in accordance therewith until such time as the same may be invalidated by final judgment in a court of competent jurisdiction.

2.    **Modification.**  Any modification of terms or amendment of provisions of this Agreement shall become effective only by supplemental written agreement between the parties.

3.    **Waiver.**  If a party fails to enforce its rights under this Agreement, such failure shall not constitute a waiver of such party's rights to enforce this Agreement strictly in accordance with its terms in the future.

4.    **Default.**  Gatherer shall not be required to take Gas at the Receipt Point(s) or deliver Gas at the Delivery Point(s) if Producer fails to comply with any and all material terms of this Agreement.  Producer shall not be required to deliver Gas at Receipt Point(s) if Gatherer fails to comply with any and all material terms of this Agreement.

AD GATH-WAHA-AE
011513

5.    <u>Governing Law</u>.  AS TO ALL MATTERS OF CONSTRUCTION AND INTERPRETATION, THIS AGREEMENT SHALL BE INTERPRETED, CONSTRUED AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS, DISREGARDING ANY CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE REFERENCE TO THE LAWS OF A DIFFERENT JURISDICTION. ANY SUIT BROUGHT RELATING TO THIS AGREEMENT IN ANY WAY SHALL BE BROUGHT IN EITHER THE FEDERAL OR STATE COURTS OF DALLAS COUNTY, TEXAS.  THE PARTIES AGREE THAT IF EITHER PARTY INSTITUTES SUIT TO ENFORCE ANY RIGHT OR OBLIGATION AGAINST THE OTHER PARTY ARISING OUT OF OR INCIDENTAL TO THIS AGREEMENT THEN THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE ATTORNEY'S FEES, COURT COSTS, AND EXPENSES RELATED THERETO.

6.    <u>Assignment</u>.  This Agreement may be assigned by either party, in whole or in part, without the prior written consent of the other party, provided that the assignee assumes the rights, obligations and liabilities of the assignor under this Agreement and that no transfer or succession to the interest of Producer hereunder, wholly or partially, shall affect or bind Gatherer until the first of the month following the date Gatherer has received a copy of the recorded transfer document or other proof satisfactory to Gatherer that the claimant is legally entitled to such interest.

7.    <u>Disconnect</u>.  If this Agreement terminates for any reason whatsoever, or any Well(s) behind a Receipt Point(s) are permanently released from this Agreement, Producer hereby consents to and agrees that Gatherer can disconnect from the Well(s), the Lease(s), or any of the facilities utilized by Producer that delivers gas at the Receipt Point(s) hereunder.  Disconnect for the purposes of this paragraph means to remove metering facilities, pipelines and any other interconnection facilities through which the gas was delivered under this Agreement and that are either owned by Gatherer or owned by the pipeline with which Gatherer contracted for the gathering or transportation services at the Receipt Point(s).  This consent and agreement by Producer in this paragraph applies to both Gatherer and Gatherer's transporter or gatherer, without distinction, and is intended in all respects to satisfy the requirements of any local, state or federal governmental agency having jurisdiction over such matters.

8.    <u>Mediation</u>.  Prior to resorting to litigation, the parties shall first attempt in good faith to resolve promptly any disputes (each a **"Dispute"**) arising out of or relating to this Agreement by negotiation between officers who have authority to settle the Dispute.  The officers shall be at a higher level of management in their respective organizations than the persons with direct responsibility for the administration of this Agreement.  If such negotiations do not resolve such Dispute within thirty (30) days of a party's notice invoking this Section, then the parties shall attempt to settle such Dispute in good faith through mediation administered by, and in accordance with the rules of, the International

AD GATH-WAHA-AE
011513

Institute for Conflict Prevention & Resolution, with the mediator having at least ten (10) years of gas transportation and gathering experience and being chosen by the parties, or, in the event the parties cannot agree within 30 days, by a civil District Judge in Dallas County, Texas. Any mediation shall occur in Dallas, Texas unless otherwise agreed by the parties. If the mediation is unsuccessful, the parties may then resort to arbitration, another dispute resolution procedure, or litigation. Nothing in this Section will limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section if application of such limitations would prevent a Party from filing a lawsuit or claim within the applicable period for filing lawsuits.

9.     **Controlling Agreement.**  This Agreement replaces and supersedes all prior agreements between Gatherer and its controlled affiliates, and Producer and its controlled affiliates, relating to the Leases, Wells or Gas that is otherwise subject to or dedicated hereunder, which prior Agreements are terminated effective as the effective date of this Agreement.

10.     **Purchase Alternative.**  Producer may request from time to time that Gatherer purchase Producer's Gas at the Delivery Point(s), with written notice to Gatherer at least sixty (60) days prior to the desired effective date. Upon receipt of such notice, Gatherer will have the right to designate another party (Designee) to negotiate with Producer, and purchase the Gas if the negotiations are successful. Producer and Gatherer (or Designee) shall attempt to negotiate in good faith mutually agreeable purchase and sale terms to be reflected in a separate agreement. If the parties cannot reach a mutual agreement within the above mentioned sixty (60) day period, then the parties will have no further obligations to negotiate as a result of Producer's request, and Gatherer (or Designee) will not purchase the Gas. If the parties are successful and enter into a purchase agreement, this Agreement shall remain in effect except that the following provisions of this Agreement will not be applicable during the term of any such purchase agreement:

(i)     **ARTICLE VI, Section 2. Third-Party Gatherers and Pipelines**
(ii)    **ARTICLE VII, NOMINATIONS, AND IMBALANCES;**
(iii)   **ARTICLE IX, Section 2. Delivery Point Specifications; and**
(iv)    **ARTICLE X, Section 3. Taxes and Royalties, only insofar as it pertains to the purchase and sale of Residue Gas.**

The following provisions will be modified to eliminate any phrases referring to the delivery of Gas by Gatherer to Producer or its Designee at the Delivery Point(s):

(i)     **ARTICLE XII, Section 4. Indemnification by Gatherer;** and
(ii)    **ARTICLE XIII, POSSESSION AND CONTROL.**

11.     **Gas Balancing.**  Producer authorizes the operator of each well hereunder to be its agent and representative for the limited purpose of providing Gatherer with written instructions to adjust allocations of gas attributable to said well for gas balancing purposes. Producer shall provide Gatherer with written notice of the name and contact information for any operator authorized to serve as Producer's agent. Any such allocation changes will be made effective on the first day of the month following

AD GATH-WAHA-AE
011513

Gatherer's receipt of the operator's written instructions.  Gatherer will not be obligated to change allocations on any well for gas balancing purposes more than four (4) times per calendar year.  Producer shall indemnify and hold Gatherer harmless from any claims resulting from the actions or inactions of any operator named as Producer's agent pursuant to this section.

**12.     Confidentiality.**  The Parties will keep confidential all of the terms, conditions and obligations of this Agreement; provided, the Parties may provide information only to the extent as may be required to effectuate the transportation or gathering of Gas, or to meet the requirements of any law, court or regulatory agency having jurisdiction over the matter for which information is sought.

This Agreement is executed by the duly authorized representatives of the parties as of the date shown above.

**GATHERER:**
**REGENCY FIELD SERVICES LLC**
**By:  Regency Gas Services LP, its sole member**
**By:  Regency OLP GP LLC, its general partner**

By: _____
Name:   Jim S. Holotik
Title:    Vice President


**PRODUCER:**
**ARABELLA PETROLEUM COMPANY, LLC**


By: _____
Name:  Jason Hoisager
Title:    President

AD GATH-WAHA-AE
011513

Gatherer's receipt of the operator's written instructions. Gatherer will not be obligated to change allocations on any well for gas balancing purposes more than four (4) times per calendar year. Producer shall indemnify and hold Gatherer harmless from any claims resulting from the actions or inactions of any operator named as Producer's agent pursuant to this section.

**12.** **Confidentiality.** The Parties will keep confidential all of the terms, conditions and obligations of this Agreement; provided, the Parties may provide information only to the extent as may be required to effectuate the transportation or gathering of Gas, or to meet the requirements of any law, court or regulatory agency having jurisdiction over the matter for which information is sought.

This Agreement is executed by the duly authorized representatives of the parties as of the date shown above.

GATHERER:
REGENCY FIELD SERVICES LLC
By: Regency Gas Services LP, its sole member
By: Regency OLP GP LLC, its general partner

By: _____

Name: Jim S. Holotik
Title: Vice President


PRODUCER:
ARABELLA PETROLEUM COMPANY, LLC


By: _____
Name: Jason Hoisager
Title: President

AD GATH-WAHA-AE
011513

## EXHIBIT "A"

### To the Gas Gathering Agreement
### Between Regency Field Services LLC and Arabella Petroleum Company, LLC
### Dated June 1, 2013

### LEASES

| Receipt Point or Well Name | Meter Number | Location | County / State |
|---|---|---|---|
| Woods #1H | TBD | Sec. 12, Blk.51, T&P RR Co/Woods, SA Survey | Reeves / TX |

AD GATH-WAHA-AE
011513

## EXHIBIT "A-1"

### To the Gas Gathering Agreement
### Between Regency Field Services LLC and Arabella Petroleum Company, LLC
### Dated June 1, 2013

Section 12, Blk.51, T&P RR Co/Woods, SA Survey

AD GATH-WAHA-AE
011513

## EXHIBIT "B"

### To the Gas Gathering Agreement
### Between Regency Field Services LLC and Arabella Petroleum Company, LLC
### Dated June 1, 2013

**Gathering Fee ($/MMbtu)**
$0.15 per MMBtu

**Compression Fees ($/Mcf)**
$0.00

**Treating Fee ($/Mcf)**
$0.00

### GATHERING FUEL RETENTION

Gatherer shall retain from Producer's entitlement seven and a half percent (7.5%) of the Receipt Point MMBtus.

### MAXIMUM PRESSURE

| Receipt Point | Maximum Pressure (Psig) |
| --- | --- |
| All | Prevailing |

AD GATH-WAHA-AE
011513

## EXHIBIT "D"
### To the Gas Gathering Agreement
### Between Regency Field Services LLC and Arabella Petroleum Company, LLC
### Dated June 1, 2013

### PROCESSING

For all Gas processed hereunder, the volume of Gas delivered to the Plant for processing (Plant Inlet Volume) shall equal the Receipt Point MMBtu's less Gathering Fuel Retention in MMBtu's.

Producer shall be allocated one hundred percent (100%) of the Process Shrinkage attributable to processing of Producer's Gas.

Producer shall be allocated and Gatherer shall retain Plant Fuel equal to four percent (4%) of the Plant Inlet Volume.

Gatherer shall redeliver to Producer at the tailgate of the Plant eighty-seven percent (87%) of the Residue Gas and, as partial compensation for services provided hereunder, Producer shall assign to Gatherer for no additional consideration all right, title and interest to thirteen percent (13%) of the Residue Gas.

Gatherer will allocate the ethane actually recovered, saved and sold by Gatherer to each Receipt Point based on the ratio that the actual gallons of ethane recovered at the Plant bears to the total theoretical gallons of ethane available from all Gas delivered to the Plant from all receipt points (including Producer's Receipt Points) on Gatherer's system, not to exceed seventy-seven percent (77%).

Plant Product recovery for the remaining hydrocarbon components shall be the actual percentage of each component recovered, saved and sold by Gatherer and allocated to the volume of Gas delivered to the Plant for processing by Producer from each Receipt Point and shall be deemed fixed for settlement purposes hereunder as follows:

| | |
|---|---|
| Propane | 95.5% |
| Normal Butane | 97.0% |
| Iso Butane | 97.0% |
| Pentanes plus | 97.0% (Natural Gasoline) |

Gatherer shall purchase from Producer at the tailgate of the Plant, all right, title and interest in and to the Plant Products attributable to Producer's Gas and shall pay Producer eighty-seven percent (87%) of the proceeds received by Gatherer from the resale of Plant Products to one or more third parties.  Gatherer's payment to Producer for Plant Products shall be based on the weighted average product price received by Processor from purchasers of all plant products (including Producer's Plant Products) at the tailgate of the Plant for each hydrocarbon component, net of all direct and indirect expenses, taxes,

AD GATH-WAHA-AE
011513

**EXHIBIT "D" - Continued**
**To the Gas Gathering Agreement**
**Between Regency Field Services LLC and Arabella Petroleum Company, LLC**
**Dated June 1, 2013**

fees and adjustments incurred by Gatherer in connection with the sale, transportation and delivery of Producer's Plant Products.

Notwithstanding anything herein to the contrary, Gatherer reserves the right to operate the Plant in any mode that Gatherer may elect from time to time, in its sole discretion, including but not limited to, full recovery, partial recovery, ethane rejection or total Plant bypass. Regardless of how Gatherer elects to operate the Plant, Gatherer will insure delivery of Producer's Residue Gas at the Delivery Point(s).

0264GGP

## FIRST AMENDMENT TO GAS GATHERING AGREEMENT

**THIS FIRST AMENDMENT TO GAS GATHERING AGREEMENT** ("First Amendment") is entered into effective this 1st day of August, 2013 by **ARABELLA PETROLEUM COMPANY, LLC** as "Producer," and **REGENCY FIELD SERVICES LLC**, as "Gatherer."

Producer and Gatherer have entered into the Gas Gathering Agreement dated June 1, 2013 Gatherer's File No. 0264GGP, covering certain leases in Reeves County, Texas ("Agreement").

Producer and Gatherer desire to amend the Agreement.

Therefore in consideration of the premises and the mutual covenants contained herein, Producer and Gatherer agree to amend the Agreement as follows:

In **ARTICLE X STATEMENTS, BILLING AND PAYMENTS 3. Taxes and Royalties.** The first sentence is deleted and replaced with the following:

> Producer will pay all severance, production, excise or similar taxes imposed or levied by the state or any other governmental entity on the Plant Products purchased hereunder, if any, and Gatherer shall remit such tax to the applicable governmental entity.

The Agreement is amended to the extent noted herein. In all other respects, it is confirmed and shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment in person or by the duly authorized officials.

**GATHERER:**
**REGENCY FIELD SERVICES LLC**
**By: Regency Gas Services LP, its sole member**
**By: Regency OLP GP LLC, its general partner**

By: _____
Name:    Mary Ann McMichael
Title:    Director, Contract Administration

**PRODUCER:**
**ARABELLA PETROLEUM COMPANY, LLC**

By: _____
Name:  Jason Hoisager
Title:    President

0264GGP

## SECOND AMENDMENT TO GAS GATHERING AGREEMENT

**THIS SECOND AMENDMENT TO GAS GATHERING AGREEMENT** ("Second Amendment") is entered into effective this 1ˢᵗ day of October, 2013 by **ARABELLA PETROLEUM COMPANY, LLC** as "Producer," and **REGENCY FIELD SERVICES LLC**, as "Gatherer."

Producer and Gatherer have entered into the Gas Gathering Agreement dated June 1, 2013 Gatherer's File No. 0264GGP, covering certain leases in Reeves County, Texas ("Agreement").

Producer and Gatherer desire to amend the Agreement.

Therefore in consideration of the premises and the mutual covenants contained herein, Producer and Gatherer agree to amend the Agreement as follows:

1. Exhibit A is deleted and replaced with Exhibit A, Revision 1, adding the Jackson #1H as a receipt point.

2. Exhibit A-2 is deleted and replaced with Exhibit A-1, Revision 1 adding the dedication from the Jackson #1H.

The Agreement is amended to the extent noted herein. In all other respects, it is confirmed and shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Second Amendment in person or by the duly authorized officials.

GATHERER:
**REGENCY FIELD SERVICES LLC**
**By: Regency Gas Services LP, its sole member**
**By: Regency OLP GP LLC, its general partner**

By: _____
Name:  Jim S. Holotik
Title:    Vice President

PRODUCER:
**ARABELLA PETROLEUM COMPANY, LLC**

By: _____
Name:  Jason Hoisager
Title:    President

EXHIBIT "A, Revision 1"

To the Gas Gathering Agreement
Between Regency Field Services LLC and Arabella Petroleum Company, LLC
Dated June 1, 2013

LEASES

| Receipt Point or Well Name | Meter Number | Location | County / State |
|---|---|---|---|
| Woods #1H | 578981112 | Sec. 12, Blk.51, T&P RR Co/Woods, SA Survey | Reeves / TX |
| Jackson #1H | TBD | Sec. 61, Blk. 34, H&TC RR Co Survey | Ward / TX |

## EXHIBIT "A-1, REVISION 1"

### To the Gas Gathering Agreement
### Between Regency Field Services LLC and Arabella Petroleum Company, LLC
### Dated June 1, 2013

Section 12, Block.51, T&P RR Co/Woods, SA Survey in Reeves, Texas

Section 61, Block 34, H&TC RR Co Survey in Ward County, Texas

0264GGP

## THIRD AMENDMENT TO GAS GATHERING AGREEMENT

**THIS THIRD AMENDMENT TO GAS GATHERING AGREEMENT** ("Third Amendment") is entered into effective this 1st day of March, 2014 by **ARABELLA PETROLEUM COMPANY, LLC** as "Producer," and **REGENCY FIELD SERVICES LLC**, as "Gatherer."

Producer and Gatherer have entered into the Gas Gathering Agreement dated June 1, 2013 Gatherer's File No. 0264GGP, covering certain leases in Reeves County, Texas ("Agreement").

Producer and Gatherer desire to amend the Agreement.

Therefore in consideration of the premises and the mutual covenants contained herein, Producer and Gatherer agree to amend the Agreement as follows:

1. Exhibit A, Revision 1 is deleted and replaced with Exhibit A, Revision 2, adding the Emily Bell CRP as a receipt point.

2. Exhibit A-2 – Revision 1 is deleted and replaced with Exhibit A-2, Revision 2 adding the dedication from the Emily Bell #1H and Emily Bell #2H.

The Agreement is amended to the extent noted herein. In all other respects, it is confirmed and shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Third Amendment in person or by the duly authorized officials.

**GATHERER:**
**REGENCY FIELD SERVICES LLC**
By: **Regency Gas Services LP, its sole member**
By: **Regency OLP GP LLC, its general partner**

By: _____
Name: Jim S. Holotik
Title: Vice President

**PRODUCER:**
**ARABELLA PETROLEUM COMPANY, LLC**

By: _____
Name: _Bill Elliott_
Title: _UP Operations_

**EXHIBIT "A, Revision 2"**

**To the Gas Gathering Agreement**
**Between Regency Field Services LLC and Arabella Petroleum Company, LLC**
**Dated June 1, 2013**

**LEASES**

| Receipt Point or Well Name | Meter Number | Location | County / State |
|---|---|---|---|
| Emily Bell CRP | TBD | Sec. 3, Blk. C-6, PSL Survey | Reeves, TX |
| Jackson #1H | 578981153 | Sec. 61, Blk. 34, H&TC RR Co Survey | Ward / TX |
| Woods #1H | 578981112 | Sec. 12, Blk.51, T&P RR Co/Woods, SA Survey | Reeves / TX |

## EXHIBIT "A-1, REVISION 2"

**To the Gas Gathering Agreement**
**Between Regency Field Services LLC and Arabella Petroleum Company, LLC**
**Dated June 1, 2013**

Section 3, Block C-6, PSL Survey in Reeves County, Texas

Section 12, Block.51, T&P RR Co/Woods, SA Survey in Reeves, Texas

Section 61, Block 34, H&TC RR Co Survey in Ward County, Texas